*In re* HYBART.

## *In re* W. M. HYBART, Lunatic.

*Lunatics—Asylums—Estate of Lunatic—Allowance to Family—Appointment of Receiver of Lunatic's Estate.*

1. The term "indigent insane," as used in Section 10, Article 11, of the Constitution, and Section 2278 of *The Code*, includes all those who have no income over and above what is sufficient to support those who may be legally dependent on the estate.

2. Under Sections 2273, 2274 and 2278 of *The Code*, a wife who lives in the mansion house of her insane husband has the right to remain there and to use such supplies as may have been provided for his family, or a sufficient quantity of them to maintain her and her family according to their condition in life, as determined by the situation and resources of the husband.

3. A first cousin, who was partially and voluntarily supported by a person when in his right mind, is not dependent upon him within the meaning of Section 2274 of *The Code*, so as to be entitled to support from his estate when declared a lunatic.

4. Where the wife is not a party to proceedings to have a receiver appointed for an insane husband's estate, the validity of the marriage cannot be attacked by *ex parte* affidavits.

5. Under Sections 1584, 1585, 1676 of *The Code*, and Chapter 89, Acts of 1889, the appointment of a receiver for an insane person's estate should be made only on the motion of the solicitor, after the wife and one or more adult children, if there are such, or some near relative or friend, have been brought before the judge *at Chambers* or in term.

6. Casual mention to the father of the wife of a lunatic that steps would be taken to have the lunatic's property taken care of by the court was not such notice to a friend or relative of the wife as required by the statute.

PETITION for the appointment of a receiver for the estate of W. M. Hybart, a lunatic and patient in the North Carolina Asylum for the Insane, heard before *Greene, J.,* at May Term, 1896, of CUMBERLAND Superior Court. The facts are set out in the opinion of Associate Justice AVERY.

*In re* HYBART.

*Messrs. T. H. Sutton* and *R. T. Gray*, for Delia J. Hybart (appellant).

*G. M. Rose, contra.*

AVERY, J. : The statute (*The Code*, Sec. 1676) provides that, where a person is declared insane and no suitable person will act as guardian, the clerk shall secure the estate of such person, according to the law relating to orphans whose guardians have been removed, which is embodied in Sections 1584 and 1585 of *The Code.* It is provided in the last-named section that the judge of the superior court before whom an action is brought by the solicitor against a removed guardian shall appoint some discreet person as receiver, to take possession of the ward's estate, to collect all money due him, to secure, loan, invest or apply the same for the benefit and advantage of the ward, under the direction and subject to the rules and orders, in every respect as the said judge may from time to time make in regard thereto.

W. M. Hybart was sent to the Asylum for the Insane at Raleigh prior to the April Term, 1896, of the superior court of Cumberland county, and at said term a verified petition was offered by C. W. Broadfoot, setting forth the fact that Hybart had become insane and was confined in the asylum ; that he had a wife to whom he was married in November, 1895, and a *first cousin, Miss Mary Weeks, who lived with him* up to a short time before his marriage, but then lived with a niece, Mrs. James N. Smith, of Fayetteville, and that Miss Weeks was very feeble, had very little means, and that her board had been paid by W. M. Hybart up to the time he went to the asylum. It set forth the further facts that Hybart's property consisted of three stores in Fayetteville, which rented in the aggregate

for the sum of $45.83 per month, and a small farm, worth about $1,500, where he lived, but which was then in need of repairs and *without a tenant.*

Upon hearing this petition and, in any aspect of the testimony, without notice. to the wife of the insane man, the judge appointed the petitioner receiver, and ordered him to pay out of his estate—

1. To W. M. Hybart, or those having him in charge, such sums of money, or supply him with such necessaries or comforts as are suitable to his condition in life, and as are approved by the superintendent of said asylum.

2. To the wife of said Hybart, $10 per month.

3. To the person who may furnish board for Miss Mary C. Weeks, $7 per month, she being partially dependent on said W. M. Hybart.

4. Taxes due on Hybart's property, insurance and necessary repairs, his doctor's bills and druggist's accounts.

5. A small amount to his nurse, who took care of him while here, a debt due H. A. Tucker & Bro., of Wilmington, of $35.

It seems that Hybart lived with his wife at his country home, where he was supplied with household and kitchen furniture, and had corn and meat in his smoke-house when he was taken to the asylum.

The receiver has taken possession of the household effects and supplies, including the trunk of Mrs. Hybart.    Meantime Mrs. Hybart has been sick, and, it appears, has incurred a doctor's bill of $33, and, expecting to be confined soon, with all of the attendant expense, she insists that $10 per month is totally inadequate to support her. The small allowance to the wife seems to have been made upon affidavits that she was of low origin, and upon the idea that her condition in life had not been changed by the misalliance of her husband with her.    The affidavits

also collaterally and incidentally attacked the validity of the marriage by averring that it was contracted when Hybart's mind was failing, and that he was duped and tricked into it by the wiles of her father, Elias Godwin.

The validity of the marriage contract between W. M. Hybart and Delia J. Hybart cannot be questioned collaterally—certainly not upon an *ex parte* affidavit suggesting that it was procured by her father. Being but 17 years old, she was a child (though capable of contracting marriage). If it be true that she was pregnant at the time of the marriage by W. M. Hybart, the child, when born in lawful wedlock, will be legitimate, and will be entitled to such protection and such benefits as the law extends to the legitimate offspring of any person whose misfortune it is to be inmured in an asylum for the insane.

In interpreting the meaning of statutes, it is the duty of the courts to look at all of the provisions of the Constitution and laws of the State that bear upon the subject of the act under consideration, and construe all as in *pari materia*. If W. M. Hybart had died at the date of his removal to the asylum, his widow could have claimed dower in his land and an allowance out of his personal property for the support of herself and child. The small amount of indebtedness would probably have been settled without sale of any, or at most, by disposing of a small portion of the real estate. A guardian would have been appointed for the child when born, and the net income of the estate would have been devoted to its nurture and education, according to its condition in life, as heir of the father. No portion of the rents would have been devoted to the support of his collateral heirs or kin next in degree to his child. If he had continued to be of sound mind, the rents of his property could not have been sequestered and devoted by a receiver to the payment of his debts

*In re* HYBART.

without giving him the right to claim personal property exemptions and the allotment of his homestead. The statute providing for sending persons of sufficient means to asylums outside of the State contemplates that the guardian shall supply funds for supporting them in such asylums, so long as their incomes may be sufficient for that purpose, " over and beyond *maintaining and supporting those persons who may be legally dependent on the estate of such insane persons.*" *Code*, Secs. 2273 and 2274.

The Constitution (Art. XI., Sec. 10) empowers the Legislature to " provide that the *indigent* deaf mute, blind insane of the State shall be cared for at the charge of the State." Construing *The Code*, Sec. 2278, with the other sections already cited, it was plainly the legislative intent to define " indigent insane " so as to include all those who have no income over and above what is sufficient to support and maintain those who may be legally dependent on the estate. Such is the construction that has also been placed upon the law by those charged with the duty of governing our charitable institutions. But if such interpretation had not been acted upon, there can be no doubt that the framers of the Constitution, who provided for the establishment and maintenance of the asylums, intended that no such narrow construction should be given to the word " indigent " as would deprive the family of one, stricken with so terrible a visitation, of the services of the head of the household, and at the same time divert to his own use the income derived from his property, when it is not more than sufficient for the support, according to their condition in life, of those who had been legally dependent upon him when in his right mind.

It is a part of the history of the Constitutional Convention of 1875 that ordinances were introduced contemplat-

*In re* HYBART.

ing the application of the profits of the estates of insane persons to the payment of the expenses of maintaining them in asylums, without regard to the necessities of those dependent on them. But, in consequence of the prevalence of a liberal spirit, those measures were defeated, and the Constitution was allowed to remain as it was originally framed in 1868.

The condition in life of Delia J. Hybart must be determined by inquiring as to the situation and resources of her husband, and not by her own environments or mode of living before marriage. Schouler on Domestic Relations, Secs. 61 and 413. The husband's obligation, when in his right mind, is to support her in a manner that comports with his circumstances in life, for her condition is his condition ; and this is true, though he may have been induced to marry her by the fear of a prosecution for seduction or bastardy. Schouler, *supra*, Sec. 61. Miss Weeks, however worthy she may be, and notwithstanding the fact that Hybart aided her voluntarily, when in his right mind, is not one of those that he would, were he restored, be under legal obligation or duty to support, and she is not therefore dependent on him within the meaning of the law. The Legislature has made no provision for supporting persons standing in such relations to an insane person as she does out of their estates, if indeed it had the power to make such disposition of his property. The law evidently contemplates giving a wife who lives in the mansion house of her husband the right to remain there and to use such supplies as have been provided for his family, or a sufficient quantity of them to maintain her and her family according to their condition in life.

The superintendents of the asylums and hospitals for the insane in this State, while adopting the construction of the Constitution which we have stated, have not, as we are

informed, been in the habit of demanding the payment of expenses out of the estates of those unfortunates who have had abundant income to defray them.   Our attention has been called to no special provisions of law under which it could be done.   Where insane men have families it is not often they have a sufficient income, apart from their own personal earnings, (which cease to come, of course, on their committal to an asylum,) to provide for those dependent on them according to their station in life.   The danger in the attempt to legislate upon the subject is that while the stricken man is being treated it may happen that his family is being starved, and probably for that reason the General Assembly has hesitated to take action.

The high character of the gentleman who is acting as receiver in the case at bar justifies the conclusion that the solicitor would have approved of the order appointing him.   The statute ( Sec. 1673 ) authorizes the clerk to appoint a guardian for any person on certificate of the Superintendent of the Asylum that he is of unsound mind. Where no suitable person will act, the clerk shall secure such estate in the same way provided, where the guardians of orphans have been removed.   *The Code*, Sec. 1676.   In such cases the clerk certifies the facts to the solicitor, (Sec. 1584,) who institutes an action on the bond of the guardian.   " The judge of the superior court before whom the action is brought shall " ( says the statute ) " have power " to appoint the receiver ( Sec. 1585 ), and it would seem to be contemplated, not that the solicitor shall bring an action, but that he shall take some action in such cases.   Interpreting the statutes together, it would seem that it was intended that the solicitor, as the representative of the State, whose office it is to look to the protection of insane persons and infants, and not any person who might by chance hear of the circumstances, should be the

*In re* HYBART.

mover. When a guardian is removed the attention of the infants and those who are near to them is called sharply to what is being done by the displacement and prosecution that follows in the court. The Act of 1889, Ch. 89, after pointing out the manner of making service on and bringing an insane person into court, provides that on the trial of any action or special proceeding to which an insane person has been made a party, such insane person shall have the benefit of any defense that might have been made for him by his guardian or attorney, whether it has been pleaded or not, and that the court, at any time before the action or proceeding is finally disposed of, may order the bringing in by proper notice of one or more of the near relatives or friends of such insane person. Conceding that this power is to be exercised within the discretion of the judge, ( which we do not determine, ) if there was ever a time when the family proper of an insane person ought to be heard, it would seem that this is one. In view of all these provisions of the law it would seem that receivers, in cases like that before us, ought to be appointed by the judge, on motion of the solicitor, either in or out of term time, and certainly that the rule ought to be, if there are any exceptions to it, that the wife and one or more adult children, if there are such, or some near relative or friend, should be brought before the judge *at Chambers* or in term before any order of this character is made. It is needless to say that a casual mention of the matter to the wife's father is not notice to him.

The order of the judge is reversed and the case is remanded, to the end that the wife be brought in, a receiver appointed, or the appointment of the acting receiver approved on motion of the solicitor, and that the court shall in other respects proceed in accordance with this opinion.

                                        Reversed.