MASSACHUSETTS GENERAL HOSPITAL *vs.* INHABITANTS
OF BELMONT.

SAME *vs.* SAME.

Middlesex.    January 20, 1919. — June 19, 1919.

Present: RUGG, C. J., LORING, BRALEY, CROSBY, & CARROLL, JJ.

*Tax,* Exemption. *Corporation,* Charitable. *Charity.* *Statute,* Construction.
*Constitutional Law,* Equal protection of the law, Due process of law. *Mas-
sachusetts General Hospital.* *McLean Hospital.* *Evidence,* Of value, Admis-
sions, Returns to State officers. *Words,* "Therefor," "Indigent persons," "Fair
cash value."

In St. 1909, c. 490, Part I, § 5, cl. 3, as amended by St. 1914, c. 518, § 1, providing
that there should not be included among the charitable institutions exempted
from taxation corporations whose property is used for an insane asylum, insane
hospital or for the treatment of mental or nervous diseases unless at least one
fourth of all property so occupied on the basis of valuation thereof, and one
fourth of the income of all trust and other funds and property held for the
benefit of such institution and not actually occupied by it for such purposes
"be used and expended entirely for the treatment, board, lodging or other direct
benefit of indigent insane persons, or indigent persons in need of treatment for
mental diseases, as resident patients, without any charge therefor to such per-
sons either directly or indirectly," the word "therefor" refers to the words
"treatment, board, lodging or other direct benefit."

The word, "therefor," according to the approved usages of language, ordinarily
refers to the last and not to a more remote antecedent noun or phrase.

It here *was said* that in a broad sense the words "indigent persons," as used in the
amendment above described, include those insane persons and persons in need of
treatment for mental diseases who by reason of poverty are unable, having due
regard to other imperative obligations resting upon them, to contribute any
substantial amount to their support at the institution.

The provision of the amendment above described, that, in order that the institutions
referred to therein should be exempted from taxation, one fourth of the property
occupied wholly or partly for the designated use, on the basis of valuation, and
one fourth of the income from property held for its benefit must be devoted
without charge to the direct benefit of indigent insane persons or of indigent
persons in need of treatment for mental diseases, does not require of necessity
a physical line of demarcation between the portion of real estate devoted to
paying patients and those given over to the use of free patients, nor does it refer
to a fractional use of the property based on numbers of patients; but it signifies
that, in order that such an institution should enjoy exemption from taxation, on
a fair basis of computation, having reference both to numbers of patients treated
so far as concerns enjoyment of property adapted for and applied to a use in com-
mon by paying and free patients and to definite property so far as there is a

strict separation between paying and free patients, one fourth of its property in value must be used for the benefit of the latter, and, computing by the same method so far as practicable, one fourth of the income described must be used likewise.

The statute above described as amended is not an unworkable piece of legislation.

General law declaratory of a scheme of public policy as to exemption from taxation may be changed by the General Court provided no constitutional guaranty is violated.

In the absence of some binding contract, no one has a legal right to the continuance of existing laws as to taxation.

The statute above described as amended does not deny to the Massachusetts General Hospital, owning property in the town of Belmont which is called the McLean Hospital and which is taxable under the provisions of the statute, the equal protection of the laws guaranteed both by the State and the federal Constitutions.

The classification in the statute above described as amended, which selects from the literary, benevolent, charitable and scientific institutions and temperance societies that before the amendment were entitled to be exempt from taxation certain insane asylums, insane hospitals, institutions "for the insane or for the treatment of mental or nervous diseases" which devote only a portion of their property and income to "indigent persons" who are patients, as described, and deprives them of the exemptions, on its face is not irrational.

The mere fact that only two institutions in the Commonwealth are included within the classifications above described, although it is a factor not to be lightly disregarded, is not conclusive against the validity of the statute, where it appears that the classification is rational.

The classification above described does not effect a clearly hostile discrimination against a particular corporation or person or class outside the limits of general usage, but is within a custom respecting classification touching the general subject which long has obtained in this Commonwealth.

The enforcement of the statute above described as amended, by the collection by the town of Belmont of a tax upon property of the Massachusetts General Hospital in Belmont known as the McLean Hospital, does not deprive the corporation of its property without due process of law.

Nor does the removal of the exemption from taxation, effected by the amendment above described, deprive such corporation of its "property, immunities, or privileges" contrary to art. 12 of the Declaration of Rights.

The tax as assessed upon the corporation as above described is not a violation of the requirement of c. 1, § 1, art. 4, of the Constitution of the Commonwealth that taxes be "proportional and reasonable."

The "fair cash value" of land for the purposes of taxation is ascertained by a consideration of all those elements which make it attractive for valuable use to one under no compulsion to purchase but yet willing to buy for a fair price, attributing to each element of value the amount which it adds to the price likely to be offered by such a buyer.

At a hearing of a petition under St. 1909, c. 490, Part I, § 77, appealing from a refusal of the assessors of the town of Belmont to abate a tax assessed under the provisions of the amendment contained in St. 1914, c. 518, § 1, above described, upon the land and buildings which for many years had been used for the McLean Hospital, the petitioner requested many rulings which correctly stated various principles which must be observed in ascertaining the fair cash value of the

property for the purposes of taxation, and the judge granted the requests with the qualification that the phrase "fair cash value," as applied to the petition under consideration, could not be expressed in a single sentence. . The petitioner excepted. *Held*, that no error was shown.

At the same hearing the petitioner asked for and the judge refused a ruling that "The 'fair cash value' of the real estate in question consists of the value of the property in the market apart from its special adaptability for hospital purposes, plus such sum as a purchaser might add to that value because of the chance that the property might at some time be sought for use as a hospital." ⁻ *Held*, that the refusal of the ruling could not be pronounced erroneous, the ruling being inapplicable to property already devoted to the uses of an insane asylum, which therefore might be thought its primary and most valuable use. *Sargent* v. *Merrimac*, 196 Mass. 171, 174, distinguished.

For the reason above stated, it likewise was *held* not to have been erroneous for the judge to have refused to rule, "The 'fair cash value' of the real estate in question is no greater than it would be if such real estate were owned by a person to whom the buildings and improvements were of no use."

And for the same reason it was *held* not to have been erroneous for the judge to refuse to rule "The 'fair cash value' of the real estate in question is the value which the petitioner could have obtained for it at the date as of which the assessment is made, if it had then desired to sell said real estate, after fair and reasonable efforts had been made to find a purchaser who would give the highest price for it."

The judge also, at the hearing above described, being asked to give as a ruling, "The 'fair cash value' of the real estate in question is the value which it would have had on April 1 [of the year in question] in the hands of any owner," gave the ruling with a modification which added the words, "including the present owner." *Held*, that the modification of the ruling was not erroneous.

At the hearing above described, the petitioner asked for a ruling, "The value of the real estate in question to the petitioner over and above its value to any other owner is not to be included in fixing the 'fair cash value,'" and also for a ruling, "The 'fair cash value' of the estate for the purposes of taxation cannot exceed the sum which the owner after reasonable effort could, at the date as of which the assessment is made, obtain for it in cash." The judge refused to make these rulings and filed a "memorandum" which tended to show that, although he accepted many correctly stated rulings of law in computing the "fair cash value" of the property in question, he still might have increased the full amount which could have been secured for the property in the market by substantial elements of its value to the petitioner alone. The petitioner excepted. *Held*, that the exception must be sustained and the case remanded to the Superior Court for further hearing.

Returns made by the petitioner under St. 1909, c. 490, Part I, § 41, showing a valuation upon its real estate, introduced in evidence at the hearing above described, were *held* not to have been inadmissible.

The petitioner in the petition above described was the Massachusetts General Hospital, having a usual place of business in Boston, but owning the property in question in Belmont. Its return to the assessors was sworn to before a notary public and not before one of the assessors of Belmont. *Held*, that the return was properly sworn to under St. 1909, c. 490, Part I, § 43, as it could not be said that the petitioner was not a person absent from Belmont.

TWO PETITIONS, filed on March 6, 1916, and February 5, 1917, in the Superior Court under St. 1909, c. 490, Part I, § 77, respectively appealing from refusals of the assessors of taxes of the town of Belmont to abate a tax of $26,334.56 assessed in 1915 upon property of the petitioner in the town of Belmont, used by the petitioner to conduct the McLean Hospital, and a tax of $25,916.68, assessed upon the property in 1916.

The petitions were referred to a commissioner, who filed a report to which were appended a transcript of all the testimony and all of the exhibits in evidence before him.. He found that the valuation fixed by the assessors in 1915 "was not unreasonable or in excess of the fair cash value of the real estate." He found that the valuation fixed by the assessors in 1916 was $43,370 in excess of the fair cash value of the real estate.

The petitions were heard by *Fox*, J., upon the reports of the commissioner and the exhibits and transcripts of testimony appended to the report, it having been agreed that the testimony contained in the transcript should be received and considered as evidence at the trial in like manner as if the witnesses were present and so testified, and that such objections to the competency of any of the evidence, whether oral or documentary, as were duly taken at the hearings before the commissioner and set out in the transcript of testimony filed by him as aforesaid might be made at the trial in the same manner as if the evidence then were offered for the first time.

At the close of the evidence, the petitioner asked for the following rulings in each case:

"1. The burden of proof rests on the respondent to show that the real estate in question is subject to the tax now in question.

"2. Upon all the evidence the petitioner is entitled to recover the amount paid as a tax on its real estate in Belmont for the year 1915 [1916, in the second case] with interest thereon from the date when said amount was paid.

"3. The assessment of a tax upon the petitioner's real estate in Belmont for the year 1915 [1916, in the second case] was illegal and void.

"4. St. 1909, c. 490, Part I, § 5, as amended by St. 1914, c. 518, § 1, does not authorize the imposition of the tax now in question.

"5. According to the true construction of St. 1909, c. 490, Part I,

§ 5, as amended by St. 1914, c. 518, § 1, the personal property and real estate owned by the petitioner and occupied by the department known as the 'McLean Hospital' is exempt from taxation if at least one-fourth of all the property so occupied wholly or partly, on the basis of valuation thereof, and one-fourth of the income of all trust and other funds and property held for the benefit of said McLean Hospital and not actually occupied by it, are used and expended for the treatment, board, lodging or other direct use of indigent insane persons, or indigent persons in need of treatment for mental diseases, as resident patients, without any charge to such persons either directly or indirectly for the use of the property so occupied or for benefits received through the expenditure of such income.

"6. The words 'without any charge therefor' in the last clause of St. 1909, c. 490, Part I, § 5, as amended by St. 1914, c. 518, § 1, are to be construed as meaning 'without any charge for the use of the property occupied by the institution or department in question for the purposes specified or for benefits received through the expenditure of the income of all trust and other funds and property held for the benefit of such institution or department and not actually occupied by it for such purposes.'

"7. Inmates of the McLean Hospital to whom a charge is made for treatment received and accommodations enjoyed there, which charge is less than the expense of furnishing such treatment and accommodations, because they are unable to pay more, so that they are maintained in the hospital at a loss to the complainant are 'indigent' within the meaning of St. 1909, c. 490, Part I, § 5, as amended by St. 1914, c. 518, § 1.

"8. If St. 1909, c. 490, Part I, § 5, as amended by St. 1914, c. 518, § 1, purports to warrant the imposition of the tax now in question, it is repugnant to the constitution of Massachusetts and to the Constitution of the United States.

"9. If St. 1909, c. 490, Part I, § 5, as amended by St. 1914, c. 518, § 1, purports to warrant the imposition of the tax now in question, it deprives the complainant of its property, immunities and privileges in violation of art. 12 of the Declaration of Rights.

"10. If St. 1909, c. 490, Part I, § 5, as amended by St. 1914, c. 518, § 1, purports to warrant the imposition of the tax now in question, it is repugnant to the requirement contained in art. 4

of § 1 of c. 1 of the Constitution of Massachusetts that assessments, rates and taxes shall be proportional and reasonable.

"11. If St. 1909, c. 490, Part I, § 5, as amended by St. 1914, c. 518, § 1, purports to warrant the imposition of the tax now in question, it denies to the complainant the equal protection of the laws in violation of the Fourteenth Amendment to the Constitution of the United States.

"12. If St. 1909, c. 490, Part I, § 5, as amended by St. 1914, c. 518, § 1, purports to warrant the imposition of the tax now in question it deprives the complainant of its property without due process of law in violation of the Fourteenth Amendment to the Constitution of the United States.

"13. The term 'fair cash value,' as used in St. 1909, c. 490, Part I, § 72, means the amount of cash which could, at the date as of which the assessment is made, be obtained for the property in the open market after fair and reasonable efforts have been made to find a purchaser who will give the highest price for it.

"14. The value of the real estate in question to the petitioner over and above its value to any other owner is not to be included in fixing the 'fair cash value.'

"15. The 'fair cash value' of the real estate in question is no greater than it would be if such real estate were owned by a person to whom the buildings and other improvements were of no use.

"16. The 'fair cash value' of the real estate in question is the value which the petitioner could have obtained for it at the date as of which the assessment is made, if it had then desired to sell said real estate, after fair and reasonable efforts had been made to find a purchaser who would give the highest price for it.

"17. The 'fair cash value' of the real estate in question is the value which it would have had on April 1, 1915, in the hands of any owner.

"18. The 'fair cash value' of the petitioner's property is not its value for the uses of an endowed institution, although, in determining its 'fair cash value,' whatever value may arise from the chance that a purchaser for this use or for any other use might appear may be considered.

"19. The 'fair cash value' of the real estate now in question is not the value to the petitioner, but its value in the hands of any

owner, and in fixing that value, the chance that it may be desired for any particular purpose may be considered.

"20. The 'fair cash value' of the estate for the purposes of taxation cannot exceed the sum which the owner after reasonable effort could, at the date as of which the assessment is made, obtain for it in cash.

"21. If there is a possibility that, by reason of the buildings and other improvements or by reason of the use to which the real estate now in question is put, a person desirous of acquiring property for use as an asylum or hospital would be willing to pay more for such real estate than purchasers in general would be willing to pay, the existence of this possibility is material for the purpose of determining the fair cash value only in so far as it may add something to the fair cash value of the real estate in the minds of purchasers in general.

"22. The 'fair cash value' is not the sum which a person desirous of acquiring property for use as an asylum or hospital might be willing to pay for the real estate now in question but the amount that could be realized at a fair sale in the open market in view of all the uses to which the real estate is reasonably adapted.

"23. The 'fair cash value' of the real estate in question consists of the value of the property in the market apart from its special adaptability for hospital purposes, plus such sum as a purchaser might add to that value because of the chance that the property might at some time be sought for use as a hospital."

The judge made the first ruling requested, and made the rulings numbered respectively 13, 16, 19, 21 and 22, subject to the qualification that the meaning of the phrase "fair cash value" as applied to these cases could not, in his judgment, be expressed in a single sentence. He modified the seventeenth ruling by adding thereto the words "including the present owner" and made that ruling as so modified. He refused to give any of the rulings numbered respectively 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 14, 15, 18, 20 and 23.

The judge adopted the findings of the commissioner as to the facts in each case and filed in the two cases a memorandum reading as follows:

"Undoubtedly there are many cases where the building adds nothing to the value of the land, for the prudent purchaser im-

mediately pulls down the building and puts up an apartment house. But in the present case the buildings are modern and well adapted to their present use, and the owner will continue that use.

"The accepted phrase 'market value' is properly applicable to all cases where there is a market, but that does not mean that monopolies must go untaxed. The taxable value of a railway station is not affected by the fact that so long as the present owner holds the franchise and the tracks, no purchaser would have any use for the building. If a part of the Harvard College yard were to be taken by right of eminent domain, the college could demand compensation for buildings destroyed, although those buildings have but one use and there is and can be but one Harvard College. The frank method of dealing with such a case would be to say that where the prudent owner would immediately replace the building if it were destroyed replacement value furnished the true test. But the conventional method is to retain the old phrase, and to expand its meaning to meet the new demand, and our courts have heretofore shown themselves to be equal to this task.

"In the present case we may assume that the assessors have taxed the land up to its full market value, that is to say, its value for dwelling house purposes, a doubtful method where the land has been dedicated to a single use and the buildings are taxed on the assumption that such use will continue. But on the other hand, they have given to the buildings a value much below their replacement value, and I agree with the commissioner that they have arrived at a fair result."

The judge accordingly ordered that the petition in the first case be dismissed and that costs be taxed as in an action of law; and in the second case he found that the petitioner was assessed and had paid a tax for the year 1916 upon valuations which were in the aggregate $43,370 more than the fair cash value of the property upon which said tax was assessed and ordered that the tax be abated in the sum of $806.68 and ordered that judgment be entered therefor with interest from October 30, 1916, the day when the tax was paid, and that costs be taxed as in an action at law.

At the request of the petitioner the two cases were reported to

this court.   If there was no error prejudicial to the petitioner in the foregoing rulings, refusals to rule, findings and orders, judgment was to be entered in each case as ordered.   If in either case there was error in the rulings, refusals to rule, findings or orders, a new trial of such case was to be had, unless this court should be satisfied that it had before it all the facts necessary for making a final disposition of the case, in which event such judgment was to be entered as this court should direct.

*M. Storey,* (*H. S. Davis* with him,) for the petitioner.

*A. L. Taylor,* (*C. P. Richardson* with him,) for the respondent.

RUGG, C. J.   These are two petitions under Part I, § 77 of the general tax act, St. 1909, c. 490, appealing from the refusal of the assessors of the town of Belmont to abate taxes alleged to have been assessed illegally for the years 1915 and 1916 respectively upon real estate of the petitioner devoted to the care of the insane under a department known as the McLean Asylum and located in that town.   The taxes were assessed pursuant to St. 1914, c. 518, § 1, which amended the exemption from taxation of the personal estate of charitable institutions and their real estate actually occupied for their corporate purposes set forth in the general tax act, § 5, cl. 3, by adding a proviso in these words: "nor shall the personal property or real estate owned by such institutions or corporations and occupied by them or any department thereof wholly or partly as and for an insane asylum, insane hospital, institution for the insane or for the treatment of mental or nervous diseases, be exempt from taxation unless at least one fourth of all property so occupied wholly or partly, on the basis of valuation thereof, and one fourth of the income of all trust and other funds and property held for the benefit of such asylum, hospital or institution and not actually occupied by it for such purposes, be used and expended entirely for the treatment, board, lodging or other direct benefit of indigent insane persons, or indigent persons in need of treatment for mental diseases, as resident patients, without any charge therefor to such persons either directly or indirectly."

The meaning and the constitutionality of St. 1914, c. 518, § 1, are questions which lie at the threshold of the case.

1. The contentions made by the petitioner as to the construction of the statute summarily stated are that the words "without

any charge therefor" in the last clause of the amendment mean in substance, without any charge for the use of the property occupied by the institution or department in question for the purposes stated or for benefits received through the expenditure of the income of trust or other funds and property held for the use of the institution or department and not actually occupied for such purposes, and that the word "therefor" refers to the use of property and income and not to "treatment, board, lodging or other direct benefit." We are of opinion that these contentions cannot be adopted. The word "therefor," according to the approved usages of language, ordinarily refers to the last and not to a more remote antecedent noun or phrase. It is the natural import of the proviso as a whole that the exoneration from charge relates to service rendered or furnished and not alone to use of property or income. The legislative history of the statute appears to disclose a purpose to make a material change respecting the exemption from taxation of property of such charitable institutions. Apparently in its practical working little if any change would result from the construction put forward in behalf of the petitioner. It is difficult and perhaps not desirable to attempt to lay down a precise and technical definition of "indigent persons" such as exists respecting the word "paupers." See *Opinion of the Justices,* 11 Pick. 537. But in a broad sense in this connection "indigent persons" include those insane persons who by reason of poverty are unable, having due regard to other imperative obligations resting upon them, to contribute any substantial amount to their support in the asylum. *Weeks* v. *Mansfield,* 84 Conn. 544. *In re Hybart,* 119 N. C. 359.

The other parts of the statute present no insuperable difficulty in construction. One fourth of the property occupied wholly or partly for the insane asylum or other designated use, on the basis of valuation, and one fourth of the income from property held for its benefit must be devoted to the direct benefit of indigent insane without charge. This does not of necessity require a physical line of demarcation between the portions of the real estate devoted to pay patients and those given over to the use of free patients. Plainly it does not mean a fractional use of the property based on numbers of patients. It signifies that, on a fair basis of computation, having reference both to numbers of patients

treated so far as concerns enjoyment of property adapted for and applied to a use in common by pay and free patients and to definite property so far as there is a strict separation between pay and free patients, one fourth in value shall be employed for the benefit of the latter. The same method, so far as practicable, may be employed in determining the expenditure of income. The statute is intended to be given a rational construction. Its operation must be adapted to the practical solution of a specified problem. Within these somewhat comprehensive lines, the calculation of the required proportions of properties doubtless can be accomplished without undue friction. The statute does not appear to be an unworkable piece of legislation. *Hemenway* v. *Milton,* 217 Mass. 230.

2. We are not able to perceive that any constitutional right of the petitioner is infringed by the statute.

The petitioner does not claim that it has any special exemption from taxation as a part of its charter rights. See St. 1810, c. 94. Whatever exemption it heretofore has enjoyed rested upon general law declaratory of a scheme of public policy. That may be changed by the General Court provided no other constitutional guaranty is offended. *Christ's Church* v. *Philadelphia,* 24 How. 30. *Grand Lodge F. & A. Masons* v. *New Orleans,* 166 U. S. 143. *Stanislaus* v. *San Joaquin & King's River Canal & Irrigation Co.* 192 U. S. 201. *Choate* v. *Trapp,* 224 U. S. 665, 674. The question somewhat argued respecting the ethics of inviting contributions from charitably disposed persons on the footing that the beneficiary of their gifts is to be exempt from taxation, and then revoking that exemption after large gifts have been made, is wholly legislative and not judicial in its nature. It presents no question of constitutional law. The law of taxation may be changed. In the absence of some binding contract, no one has a legal right to the continuance of such laws. *Hanscom* v. *Malden & Melrose Gas Light Co.* 220 Mass. 1, 8. *Cahen* v. *Brewster,* 203 U. S. 543.

3. The statute here assailed does not deny to the petitioner the equal protection of the laws guaranteed both by the State and Federal Constitutions. The Fourteenth Amendment to the Federal Constitution secures the petitioner against being singled out either by name or otherwise, directly or indirectly, and subjected to heavier burdens than are imposed upon other like cor-

porations. Reasonable classification so far as concerns taxation or exemption from taxation may be made by the Legislature. The constitutional principles respecting the basis of such classification have been declared in numerous cases. It was said by Chief Justice Fuller in *Giozza* v. *Tiernan*, 148 U. S. 657, 662: "Nor, in respect of taxation was the amendment intended to compel the State to adopt an iron rule of equality; to prevent the classification of property for taxation at different rates; or to prohibit legislation in that regard, special either in the extent to which it operates or the objects sought to be obtained by it. It is enough that there is no discrimination in favor of one as against another of the same class. . . . And due process of law within the meaning of the amendment is secured if the laws operate on all alike, and do not subject the individual to an arbitrary exercise of the powers of government." In *Southern Railway* v. *Greene*, 216 U. S. 400, at page 417, occur these words: "While reasonable classification is permitted, without doing violence to the equal protection of the laws, such classification must be based upon some real and substantial distinction, bearing a reasonable and just relation to the things in respect to which such classification is imposed; and classification cannot be arbitrarily made without any substantial basis. Arbitrary selection, it has been said, cannot be justified by calling it classification." In *Citizen's Telephone Co. of Grand Rapids* v. *Fuller*, 229 U. S. 322, at page 329, is found the statement: "The power of exemption would seem to imply the power of discrimination, and in taxation, as in other matters of legislation, classification is within the competency of the Legislature;" and at page 331: "Granting the power of classification, we must grant Government the right to select the differences upon which the classification shall be based, and they need not be great or conspicuous. *Keeney* v. *New York*, 222 U. S. 525, 536. The State is not bound by any rigid equality. This is the rule; — its limitation is that it must not be exercised in 'clear and hostile discriminations between particular persons and classes.' See 223 U. S. 59, 62, 63. Thus defined and thus limited, it is a vital principle, giving to the Government freedom to meet its exigencies, not binding its action by rigid formulas but apportioning its burdens and permitting it to make those 'discriminations which the best interests of society require.'"

It is to be borne in mind constantly that the present statute relates only to the conditions under which exemption from the ordinary burdens of taxation is to be granted to certain kinds of charitable corporations. It is not a classification for purposes of taxation but of exemption from taxation. We consider only the question presented and do not undertake to decide whether the statute would be open to successful attack as a classification for taxation.

The classification declared by the present statute is the selection of insane asylums, insane hospitals, and institutions "for the insane or for the treatment of mental or nervous diseases," the separation of these from all other charities and a declaration of different conditions respecting them as compared with other charities. Such a classification on its face is not irrational. The Legislature has for many years made various classifications touching the exemption from taxation of charitable corporations. For example, all the real and personal estate of incorporated agricultural societies is exempted from taxation, while only the portions of the real estate and buildings of incorporated horticultural societies used for their offices, libraries and exhibitions are tax free. Only those portions of houses of religious worship appropriated to such worship and instruction are exempted from taxation. The tax exempt property of incorporated Grand Army posts or veterans' associations is limited to $20,000, but there is no such limitation upon the value of real and tangible personal estate held for units of the volunteer militia. The Bunker Hill Monument, although owned by a private association (St. 1823, c. 1, and St. 1824, c. 122), has been exempted by name from taxation. Parsonages owned by religious societies used exclusively by their ministers as dwelling houses are not exempt from taxation, although dwelling houses of literary, educational, charitable and scientific institutions and occupied permissively by their officers are so exempt. *Third Congregational Society of Springfield* v. *Springfield*, 147 Mass. 396. See general tax act, Part I, § 5, cls. 4–7. There are numerous special statutes applying to named charities, rules as to taxation and to tax exemptions differing somewhat in their substance and details from each other and from the general law. Yet it never has been suggested that these are unconstitutional discriminations or preferences. See for example *Northampton* v.

*County Commissioners,* 145 Mass. 108; *Old South Association in Boston* v. *Boston,* 212 Mass. 299; *Mount Auburn Cemetery* v. *Mayor & Aldermen of Cambridge,* 150 Mass. 12; *Harvard College* v. *Aldermen of Boston,* 104 Mass. 470.

These different provisions, which are in the nature of classifications of charitable corporations for purposes of exemption from taxation, have existed for many years and no contention has been made that they transcended the constitutional power of the Legislature.   These statutes have the support of a long and unquestioned usage.   Of course this is not decisive.   But clear reason is required to upset as contrary to the Fourteenth Amendment a settled system of tax exemptions.

One ground upon which exemptions from taxation of charitable institutions like the petitioner can be justified in a constitutional sense is that they minister to human and social needs which the State itself might and does to a greater or less extent undertake to satisfy.   The ultimate obligation of the State thus is discharged by the private charity.   To that extent the State is relieved of its burden.   *Opinion of the Justices,* 195 Mass. 607, 609.   An exemption from taxation is in the nature of an appropriation of public funds, because, to the extent of the exemption, it becomes necessary to increase the rate of taxation upon other properties in order to raise money for the support of government.   Appropriations of public funds for charitable uses need not be uniform. Exemptions need not be on the same footing for all, although they cannot be framed upon an arbitrary or discriminatory basis.   It is not necessary to cite the many special statutes granting appropriations to certain educational institutions and not to others, the constitutionality of which, so far as we are aware, has not been assailed.

It must fairly be assumed on this record, it seems to us, that the present classification includes only the petitioner and one other institution, the New England Sanitarium, located in the town of Stoneham.   The simple circumstance that only two institutions may be included within a tax exemption classification is not conclusive against its validity.   It is a factor not to be lightly disregarded.   The fundamental question, however, is whether the classification rests upon a rational foundation or is arbitrary, oppressive, whimsical or visionary.   The fact that laws are found

to be so fashioned as to be applicable in their practical operation to a single person oftentimes points strongly to a designed inequality and unfair discrimination. *Austin* v. *Murray*, 16 Pick. 121. *Cotting* v. *Kansas City Stock Yards Co.* 183 U. S. 79, 103. *McFarland* v. *American Sugar Refining Co.* 241 U. S. 79, 86. But the present statute does not appear to us to fall within the class illustrated by the cases just cited. A tax statute, although disguised as a classification but in truth designed as revealed by its practical operation to select for hostile discrimination a single person or corporation from other persons or corporations of like legal standing or nature, cannot stand under the requirement for equal laws. But a tax exemption statute which rests upon a rational classification is not to be stricken down merely because affecting a few or even one in its practical operation. Such a classification as is made by the present statute may be thought to bear a reasonable and just relation to a substantial distinction among charities. Insane asylums organized and operated by private corporations may be thought to be different in respect of tax exemption from other charities.

The history of the statute as narrated in the record bears some indication of a discriminatory basis. It affords ground for the argument put forward by the respondent that it was designed to relieve what it terms an injustice arising from the exemption from taxation of so much property within its territorial limits. Manifestly no such relief could have been thought to be afforded provided the statute is workable and can and will be complied with by the petitioner. We think it can be, as already pointed out. Giving due weight to all the arguments urged, however, they do not appear to us to be of countervailing weight. This statute does not establish a clearly hostile discrimination against a particular corporation or person or class outside the limits of general usage, but on the contrary is within a custom respecting classification touching this general subject which long has obtained in this Commonwealth. "The Fourteenth Amendment was not intended to compel the State to adopt an iron rule of equal taxation." *Bell's Gap Railroad* v. *Pennsylvania*, 134 U. S. 232, 237. "Hardship, impolicy or injustice of State laws is not necessarily an objection to their constitutional validity." *Magoun* v. *Illinois Trust & Savings Bank*, 170 U. S. 283, 293, 295.

*County of Mobile* v. *Kimball,* 102 U. S. 691. The power of the General Court with reference to the extent and character of exemptions of charities from taxation is very broad, although not unlimited. Without undertaking further to define the restrictions upon legislative discretion in this particular, it is sufficient to say that we think it cannot be pronounced beyond the power of the Legislature to establish institutions, designed for the treatment and care of those afflicted with mental disease and disorder as a class by themselves among charities for purposes of tax exemption under all the conditions disclosed by this record, even though only two institutions appear to be affected.

4. The reasons already stated seem to us to be sufficient to show that the statute does not deprive the petitioner of its property without due process of law. *Ohio Tax Cases,* 232 U. S. 576, 589. *Brushaber* v. *Union Pacific Railroad,* 240 U. S. 1, 24, 25. *Metropolitan Street Railway* v. *New York,* 199 U. S. 1, 46, 47.

5. It follows from the grounds upon which this opinion rests that the petitioner is not deprived of its "property, immunities, or privileges" contrary to art. 12 of the Declaration of Rights of the Constitution of Massachusetts. The removal of an exemption from taxation of the property of a class of charities, unless certain reasonable conditions as to the administration of their charitable functions are observed, does not reach to such deprivation.

6. The taxes in question do not violate the requirements of c. 1, § 1, art. 4 of the Massachusetts Constitution that taxes be "proportional and reasonable." The grounds of decision already elaborated conclude this point. There is nothing at variance with this view in *Perkins* v. *Westwood,* 226 Mass. 268, and the numerous decisions and opinions there referred to.

7. The general tax act lays down in Part I, § 50, as the guide for assessors, that they "shall at the time appointed therefor make a fair cash valuation of all the estate, real and personal, subject to taxation." "Fair cash value" is also referred to as the standard in § 72, respecting the granting of abatement. In § 47, the duty of assessors touching the valuation both of real and of personal estate of persons who do not bring in lists, is to "estimate its just value." By St. 1909, c. 517, § 3, a penalty is visited on assessors for knowingly valuing property above or below its "full and fair cash value." The words "fair cash value" have come

before the court in several cases for construction and definition. In *National Bank of Commerce* v. *New Bedford*, 155 Mass. 313, it was said by Mr. Justice Holmes at page 315: "Value refers to exchange. The cash value of an article is the amount of cash for which it will exchange in fact. That amount depends on the opinion of the public of possible buyers, or of that part of it which will pay the most." The thing to be valued in that case was shares of stock in a corporation, and it was said further: "As a rule, the fair cash value of shares having a market is best ascertained by finding the price at which they sell in the market." In *National Bank of Commerce* v. *New Bedford*, 175 Mass. 257, 262, it was said by Chief Justice Holmes: "But, generally speaking, when a statute requires the 'fair cash value' of property on a certain day to be ascertained, Pub. Sts. c. 13, § 8, it refers to the actual judgment of the public as expressed in the price which some one will pay, not to what the court at a later time may think would have been a wiser opinion. It means the highest price that a normal purchaser, not under peculiar compulsion, will pay at that time to get that thing. *Bradley* v. *Hooker*, 175 Mass. 142. If the word 'fair' is thought to add a little latitude to the definition and to allow a correction of whatever was the fleeting accident of a moment of panic by the consideration of values on either side of the precise time fixed by the statute, that correction has been made." This case had to do with the value of national bank stock. In *Blackstone Manuf. Co.* v. *Blackstone*, 200 Mass. 82, the point at issue was the correct rule for the assessment for taxation of a dam, canal and other water power development in Massachusetts applied to a mill in Rhode Island, where also was a small part of the fall. It was said by Chief Justice Knowlton at page 89: "the question before us is, What is the value of the petitioner's property, having reference to any and all the uses to which it is adapted. . . . If conditions in Rhode Island were disregarded, the value of the property in Massachusetts, including with the land and water the fall which the land furnishes, and the dam, pond, canals and other appurtenances, would be estimated in reference to the most profitable uses to which it could be put, and especially its use to furnish power to a mill in Massachusetts, situated near the line of the State of Rhode Island. Inasmuch as it has been joined to the property in Rhode Island and used with the slight

additional fall there to produce a single unit of water power, and inasmuch as it is found that this is the most valuable use to which it can be put, there is no reason why its value should not be considered in reference to the use to which it is adapted, and which is now made of it in connection with the property in the other State." In *Essex Co.* v. *Lawrence,* 214 Mass. 79, a case respecting the taxation of land with a developed water power, it was said at page 89: "Original cost with deductions, if any, for depreciation, replacement cost and productive power are all legitimate elements bearing upon true value, but no one of them is decisive. The standard established by the law is fair cash value, having reference to any and all uses to which the property is reasonably adapted." In *Lodge* v. *Swampscott,* 216 Mass. 260, at page 263, occur these words: "The dominant intention of the statute is that property shall for the purpose of taxation be assessed at its fair cash value considered with reference to all the uses to which it may be put by any owner." This is substantially the same language used in *Tremont & Suffolk Mills* v. *Lowell,* 163 Mass. 283, at page 288, and *Troy Cotton & Woolen Manufactory* v. *Fall River,* 167 Mass. 517, at page 523, in each of which the point in issue was the rule for the valuation of large manufactories presumably not frequently changing ownership through actual exchange of the property for cash. These statements afford the rules by which to determine the valuation for purposes of taxation of the petitioner's property.

Frequently, in support of principles of general application, decisions in tax cases and in eminent domain cases are cited indifferently. Commonly fair cash value or fair market value affords adequate compensation to an owner whose property has been taken from him by eminent domain, and is the right basis for the assessment of taxes. *Boston Chamber of Commerce* v. *Boston,* 195 Mass. 338; affirmed in 217 U. S. 189. *Perley* v. *Cambridge,* 220 Mass. 507, 512, 513. *Smith* v. *Commonwealth,* 210 Mass. 259. But the rules in the two classes are not always and necessarily the same. There may be instances where the market or fair cash value is small or almost negligible and does not represent indemnity or the "reasonable compensation" required by art. 10 of our Declaration of Rights. *Beale* v. *Boston,* 166 Mass. 53. *Wall* v. *Platt,* 169 Mass. 398.

It is possible that taxation cases may arise where, in order to give rational effect to the declared intention of the Legislature, the words "fair cash value" must be given a somewhat more elastic significance than heretofore has been attributed to them. See, for example, taxation of railroad depots and stations, St. 1906, c. 463, Part II, § 79; of land and property owned by street railway companies, *Connecticut Valley Street Railway* v. *Northampton*, 213 Mass. 54; of underground conduits, poles and wires of electric light and power companies, St. 1909, c. 439, § 1, where there is no right of sale in its ordinary sense. See *Clemens Electrical Manuf. Co.* v. *Walton*, 173 Mass. 286, 300; *S. C.* 206 Mass. 215, 221; and *Attorney General* v. *Haverhill Gas Light Co.* 215 Mass. 394. But it is not necessary to discuss or decide that point, and no opinion respecting it is expressed.

The law respecting the meaning and means of finding out the "fair cash value" in taxation cases is to be followed in the case at bar. It is manifest, however, that "fair cash value," as applied to land ordinarily must be ascertained by methods different from those applied to cotton, coal or active stocks, which are dealt with daily in the public market and which therefore have an easily determined cash value. Land commonly is not and cannot be sold at a moment's notice. The value of a tract of land for purposes of sale, that is, its fair cash value, is ascertained by a consideration of all those elements which make it attractive for valuable use to one under no compulsion to purchase but yet willing to buy for a fair price, attributing to each element of value the amount which it adds to the price likely to be offered by such a buyer.

8. The statements of the law framed in the several requests for rulings upon this subject presented by the petitioner and numbered 13, 16, 19, 21 and 22 in substance conformed to correct principles. These requests were given by the judge subject to the qualification that the phrase "fair cash value" as applied to the present case could not be expressed in a single sentence. In this respect no error is shown. The numerous requests for rulings demonstrate the necessity of several sentences to express the different considerations to be borne in mind in reaching a result.

9. The petitioner's request for ruling 23 is framed in almost the precise words of a part of the opinion in *Sargent* v. *Merrimac*,

196 Mass. 171, 174. That case, however, was one for the assessment of damages for a taking by eminent domain, where it was sought to swell what otherwise would have been the damages by a consideration of special adaptability of the land for water supply purposes, a use to which it had not been devoted. In the case at bar the property already was devoted to the uses of an insane asylum, which therefore might be thought its primary and most valuable use. The rejection of the rule put forward in this request cannot be pronounced erroneous under these circumstances.

10. For the same reason there was no error in denying the petitioner's requests 15 and 18 and in the modification with which request 17 was granted. The present use by the petitioner was a factor which ought to be taken into account in reaching a conclusion.

11. The denial of the petitioner's requests 14 and 20 must be treated in connection with the so called "memorandum" filed by the judge. The fair inference from this statement by the judge and his refusals to rule is that the judge did not confine himself to the rules of law already stated, which in cases of this sort restrict the value to an ascertainment based on cash or market value. Requests for rulings 14 and 20 were correct and pertinent to the facts. The denial of these requests combined with the statement made by the judge indicates that an appreciable increment of value might have been added due to the special and peculiar value which the property had to the petitioner above that which it had in the market. It tends to show that he did not confine himself to a consideration of what a prudent person in the position of the petitioner would have given for the property rather than not have bought it, but went beyond a point where there would have been competition among probable buyers into the region of value to the petitioner alone. Following every instruction of law accepted by the judge for his guidance, he still in reaching his conclusion might have increased the full amount which could have been secured for the property in the market by substantial elements of its value to the petitioner alone. In effect this is the same error which arose and was pointed out in *National Fireproofing Co.* v. *Revere*, 217 Mass. 63, 65. The same fundamental difficulty is illustrated in principle, although from a different point of approach, in *New York* v. *Sage*, 239 U. S. 57, 61, *Pastoral*

*Finance Association, Ltd.* v. *The Minister,* [1914] A. C. 1083, 1088, 1089, and in *Sidney* v. *Northeastern Railway,* [1914] 3 K. B. 629, 636, 637.

12. The returns of the petitioner made under the general tax act, Part I, § 41, and showing a valuation upon its real estate, were not inadmissible in evidence on the question of value. *Union Glass Co.* v. *Somerville,* 228 Mass. 202, 204. Returns under another statute referred to in that decision and held inadmissible in *Brackett* v. *Commonwealth,* 223 Mass. 119, 126, have no application to the returns here in question.

13. The list presented by the petitioner, sworn to before a notary public was sufficient under the general tax act, Part I, § 43. It hardly can be said that the petitioner was not a person absent from Belmont. *Sears* v. *Nahant,* 215 Mass. 329, 332. See *Collector of Taxes of Boston* v. *Mt. Auburn Cemetery,* 217 Mass. 286.

14. It cannot be affirmed on this record that the errors of law may not have affected injuriously the rights of the petitioner. It is the duty of a tribunal charged with the finding of facts to weigh the evidence guided by correct rules of law. It follows that the case must stand for further hearing in the Superior Court. *John Hetherington & Sons, Ltd.* v. *William Firth Co.* 210 Mass. 8, 18. *Atlantic Maritime Co.* v. *Gloucester,* 228 Mass. 519, 523.

*So ordered.*