[Civ. No. 1761. Fourth Appellate District.—January 30, 1936.]

O. P. GOODALL et al., Respondents, v. PERRY BRITE et al., Appellants.

542

Thomas Scott, District Attorney, W. A. McGinn, Assistant District Attorney, and Borton & Petrini for Appellants.

G. Leroy Johnson, Nutter & Rutherford and Stephen Dietrich, as *Amici Curiae* on Behalf of Appellants.

Siemon, Claflin & Maas, Hartley F. Peart, Howard Hassard and Finlayson, Bennett & Morrow for Respondents.

Elvon Musick, Howard Burrell and E. Perry Churchill, as *Amici Curiae* on Behalf of Respondents.

MARKS, J.—The plaintiffs are citizens and taxpayers of the County of Kern. The individual defendants are the members of the board of supervisors of the county.

Kern County maintains a hospital for the hospitalization of the sick and injured as well as for the care of the indigent poor and indigent aged of the county. The hospital is a well-equipped institution. With the tacit, if not the express, consent of the supervisors it is the practice to admit as patients persons well able to pay for hospitalization in private institutions, either themselves or through relatives legally liable for their support, and also, persons who can pay only part of the cost of their hospitalization in the county institution and who obviously cannot pay the higher costs of private

hospitalization. The plaintiffs challenged the right of defendants to use county funds to provide hospital care for these two classes of patients except in certain instances where such practice is permitted by statute.

It is freely conceded by counsel for defendants that they have provided hospitalization in the county hospital for these two classes of patients and that they will continue to do so if not enjoined by order of court. It is also admitted that in the past both these classes of patients have been asked to make "donations" towards the cost of their hospitalization; that no charges have been made against them and that no effort has been made to collect from any of them where the donations had not been made. It is also apparent from the evidence that some citizens of Kern County who were financially able to pay for hospitalization and treatment in private institutions had been hospitalized for considerable periods of time in the county hospital without making any payments therefor. The trial court, on ample evidence, found there were sufficient private hospitals in Kern County to satisfactorily care for all cases hospitalized in the county hospital where the patients, or relatives legally liable for their support, could have paid for private hospitalization. Therefore, we do not have presented here any question of the right of a county hospital to receive a patient possessing substantial means where there was no other hospital within a reasonable distance which could afford him proper care and treatment.

Boards of supervisors are given the express power to establish and maintain county hospitals and to provide rules for their government and management. (Sec. 4223, Pol. Code.) A like power is given them to establish and maintain almshouses and county farms. (Sec. 4224, Pol. Code.) In Kern County the poor are cared for at the county hospital. Therefore, it is a combination county hospital and almshouse.

Defendants maintain that as the board of supervisors of Kern County is given the power to "establish" and "maintain" a county hospital and provide rules for its "government" and "management" the question of who shall be admitted and upon what terms is within the sound discretion of the board and cannot be controlled by injunction. They also urge that section eleven of article XI of the Constitution vests in counties police powers which are as broad as those possessed by the state, except where prohibited by statute.

From this they argue that as the promotion of the health of the residents of Kern County, as well as the promotion of their general welfare, is one of the principal police powers given under this section they may admit to the hospital any resident of Kern County possessing the necessary qualifications of residence regardless of his ability to pay and without making any charge against him.

We will first consider these questions from the point of view of the admission to the hospital of those patients who either themselves, or through legally liable relatives, are able to secure and pay for hospitalization and treatment in private institutions.

Section thirty-one of.article IV of the Constitution ''took from the legislature the power to give, lend, or authorize the giving or lending of the state's credit, or that of any county, city and county, city, or township, or other political corporation or subdivision of the state, in aid of or to any person, association, or corporation, municipal or otherwise, or to pledge the credit thereof in any manner whatever, for the payment 'of the liabilities of any individual, association, municipal or other corporation whatever; or to make or authorize the making of any gift of any public money or thing of value to any individual, municipal or other corporation whatever.

''These limitations divested the legislature of all power to make appropriations of money to any private or *quasi*-public corporation, or to make any gift to any municipal or public corporation not under the exclusive control and management of the state. It also deprived the legislature of the power to authorize counties to make donations or gifts or pledges of credit to such associations. The Constitution does not give to any department of the state government any power whatever to engage in private business or enterprise, or to manage and control private corporations or *quasi*-public corporations for private profit, although such corporations may be carrying on enterprises or performing functions which are for general public benefit and which tend to promote the general welfare. Our state government has no such powers.'' (*People* v. *San Joaquin Valley etc. Assn.*, 151 Cal. 797 [91 Pac. 740].)

 It has been held that this same section of the Constitution prohibits cities and counties from making any gifts

of public funds and of using public funds for private purposes. (*Pacific Mutual Life Ins. Co.* v. *County of San Diego,* 112 Cal. 314 [41 Pac. 423, 44 Pac. 571]; *City of Oakland* v. *Garrison,* 194 Cal. 298 [228 Pac. 433]; *Chapman* v. *City of Fullerton,* 90 Cal. App. 463 [265 Pac. 1035].) The legislature cannot authorize the use of county funds for any such purposes. (*Conlin* v. *Board of Supervisors,* 99 Cal. 17 [33 Pac. 753, 37 Am. St. Rep. 17, 21 L. R. A. 474]; *Conlin* v. *Board of Supervisors,* 114 Cal. 404 [46 Pac. 279, 33 L. R. A. 752]; *Johnston* v. *County of Sacramento,* 137 Cal. 204 [69 Pac. 962].)

It must be conceded that while the board of supervisors has the general power to adopt rules and regulations for the operation of the Kern County hospital, that power must be exercised within the limits of its constitutional powers. It must be further conceded that if its acceptance for hospitalization of patients who, themselves, or through legally liable relatives can provide efficient hospitalization elsewhere amounts to a gift of public funds to private persons which is prohibited by section thirty-one of article IV of the Constitution, its continuance may be enjoined by the courts.

In discussing the extent of the grant of police powers to municipalities by section eleven of article IV of the Constitution the Supreme Court in the case of *Miller* v. *Board of Public Works,* 195 Cal. 477 [234 Pac. 381, 38 A. L. R. 1479], said: "The police power of a state is an indispensable prerogative of sovereignty and one that is not to be lightly limited. Indeed, even though at times its operation may seem harsh, the imperative necessity for its existence precludes any limitation upon its exercise save that it be not unreasonably and arbitrarily invoked and applied. (*Hadacheck* v. *Sebastian,* 239 U. S. 394 [Ann. Cas. 1917B, 927, 60 L. Ed. 348, 36 Sup. Ct. 143]; *District of Columbia* v. *Brooke,* 214 U. S. 138, 149 [53 L. Ed. 941, 29 Sup. Ct. 560]; see, also, Rose's U. S. Notes.) It is not, however, illimitable and the marking and measuring of the extent of its exercise and application is determined by a consideration of the question of whether or not any invocation of that power, in any given case, and as applied to existing conditions, is reasonably necessary to promote the public health, safety, morals (*Hannibal etc. R. R. Co.* v. *Husen,* 95 U. S. 465, 470, 471 [24 L. Ed. 527]; *Boston*

*Beer Co.* v. *Massachusetts,* 97 U. S. 25 [24 L. Ed. 989]), or general welfare of the people of a community. (*Chicago, B. & Q. Ry. Co.* v. *Illinois,* 200 U. S. 561, 592 [4 Ann. Cas. 1175, 50 L. Ed. 596, 26 Sup. Ct. 341]; see, also, Rose's U. S. Notes.)
. . .

"In its inception the police power was closely concerned with the preservation of the public peace, safety, morals, and health without specific regard for 'the general welfare'. The increasing complexity of our civilization and institutions later gave rise to cases wherein the promotion of the public welfare was held by the courts to be a legitimate object for the exercise of the police power. As our civic life has developed so has the definition of 'public welfare' until it has been held to embrace regulations 'to promote the economic welfare, public convenience and general prosperity of the community'. (*Chicago, B. & Q. Ry. Co.* v. *Illinois, supra.*) Thus it is apparent that the police power is not a circumscribed prerogative, but is elastic and, in keeping with the growth of knowledge and the belief in the popular mind of the need for its application, capable of expansion to meet existing. conditions of modern life and thereby keep pace with the social, economic, moral, and intellectual evolution of the human race. In brief, 'there is nothing known to the law that keeps more in step with human progress than does the exercise of this power'. (*Streich* v. *Board of Education* (34 S. D. 169 [147 N. W. 779, Ann. Cas. 1917A, 760, L. R. A. 1915A, 632]) *supra*), and that power 'may be put forth in aid of what is sanctioned by usage, or held by the prevailing morality or strong and preponderant opinion to be greatly and immediately necessary to the public welfare'. (*Noble State Bank* v. *Haskell,* 219 U. S. 104 [Ann. Cas. 1912A, 487, 32 L. R. A. (N. S.) 1062, 55 L. Ed. 112, 31 Sup. Ct. 186]; see, also, Rose's U. S. Notes.)" See, also, *Coelho* v. *Truckell,* 9 Cal. App. (2d) 47 [48 Pac. (2d) 697].

In *Jardine* v. *City of Pasadena,* 199 Cal. 64 [248 Pac. 225, 48 A. L. R. 509], it is said: "The selection of the hospital site was a matter within the legislative discretion of the board of directors of the city, and unless in the exercise of that discretion the board acted arbitrarily and unreasonably, its action ought not to be enjoined.

" 'The location, establishment and maintenance of such an institution is clearly within the scope of the police power of

the City. General police authority to protect the public health is conferred upon the City by section 11 of article XI of the state Constitution, which provides that "any county, city, town, or township may make and enforce within its limits all such local, police, sanitary and other regulations as are not in conflict with general laws". ' "

It follows as an inescapable conclusion from what has been said in the cases from which we have quoted that the promotion of the public health and general welfare of the citizens of Kern County falls within the powers granted to the county by section eleven of article XI of the Constitution. Does the hospitalization in the county hospital of those able to secure efficient hospitalization in other institutions promote the health and general welfare of the citizens of Kern County? The answer to this question will determine whether that policy falls within the protection of the provisions of section eleven, and also whether the expenditure of public funds for that purpose amounts to a use of them for a public purpose or gifts to private persons. This last follows, because, if the use of the money for the purposes specified promotes the health or general welfare of the people of Kern County, that in itself should be held to be expenditures for a public purpose and not gifts to private persons.

In approaching this question it should be borne in mind that the record establishes the fact that there are excellent privately owned hospitals in Kern County with sufficient facilities to care for those who can pay for their care and treatment. It seems, therefore, that the question is not so much the preservation of the health and general welfare of the financially able citizens of the county as it is one of the preservation of their private resources. If a patient can be given the same and equally efficient care and treatment in a private hospital that he can receive in the county institution his choice of a hospital does not determine his chances of recovery but merely the amount he must pay to be healed, and whether he will pay the established charge of a private institution, or nothing or the small donation hoped for by the county hospital. The preservation of the health and general welfare of the citizens of the county is a question of the prevention and cure of disease generally, and not the accomplishment of these ends by any particular means or in any particular institution. We, therefore, conclude that the ad-

mission and treatment of patients in the county hospital who, either themselves or through legally responsible relatives, can provide themselves with equally efficient care and treatment in private institutions does not promote the health and general welfare of the citizens of Kern County and is not a proper exercise of the police power of that county and results in the use of public money for private purposes.

We have further facts in the record bearing upon the question of the use of public money for private purposes. The defendants estimated the cost of hospitalization in the county hospital at three dollars per day per patient. In arriving at this figure no account was taken of a capital investment of several hundred thousand dollars, nor of depreciation. The amount of daily cost was reached by taking the total number at the hospital, which included the dependent aged, as the divisor, and the total spent for the operation of the hospital as the dividend, and dividing the result thus obtained by the number of days in the year. It is obvious that the daily cost of caring for an aged poor person who does not require hospitalization would not be as great as that of a strictly hospital patient. It is also obvious that the average daily cost of care and treatment of a patient hospitalized for a simple illness would not be as great as that of a serious operative case. The method used in reaching the daily cost per patient was so inaccurate and unbusinesslike that the result could not reflect the true daily cost to the county of any one patient. This must have resulted in gifts of county money to at least those patients who paid nothing and to those who paid only three dollars per day and who were serious operative cases.

When we approach the question of those patients who are admitted to the county hospital and who cannot pay for hospitalization in private institutions but who can pay something towards their care and treatment we have an entirely different situation from the one we have been considering. We must bear in mind that providing hospital facilities to those legally entitled thereto is a proper exercise of the police power of the county (*Jardine* v. *City of Pasadena, supra*) as it tends to promote the public health and general welfare of the citizens of the county. (*Miller* v. *Board of Public Works, supra.*) In the second phase of the case we have the problem of the care of the health and the promotion of the

general welfare of what we may term the deserving needy but not the pauper class of the county. This class must be hospitalized at the county hospital or permitted to suffer without proper care. It is common knowledge that this class composes a considerable proportion of the body of the citizenship of any county. As a rule those composing it are honest, industrious, and often thrifty people whose welfare should be of first concern to any governmental agency. It is admitted that a resident pauper must be hospitalized at public expense. This is a matter of pure humanity and no one, solely because of poverty, should be permitted to suffer because of lack of funds. The same reasons apply with greater force to the class we are considering. We can visualize the head of a family who has employment and can keep it,—an honest worker, frugal and thrifty, who supports his family, educates his children and has perhaps acquired an equity in a modest home. If he is injured, not in the course of his employment, the family income stops and he may require hospitalization and may lack the funds with which to enter a private institution. Must it be said that he should be refused admission to the county hospital because he is not a pauper when if he were a pauper he would be admitted without question? This would amount to the penalizing of honest industry, thrift and independence and would place a premium on indolence and shiftlessness. Under the principles of humanitarianism, and in the interest of a sound policy, we are compelled to hold that a patient in need of hospitalization, who cannot himself, or through legally liable relatives, pay the charges of a private institution, should be admitted to the county hospital because the care of such sick or injured promotes the public health and general welfare of the community in which he lives.

If it were necessary we could find another satisfactory reason for the admission of this class of patients to the county hospital. It is admitted that indigent persons are to be admitted when in need of hospitalization. As far as we know the term "indigent" has not been defined in California in so far as its use in connection with admissions to county hospitals is concerned. It has been defined in other states chiefly in connection with the admission of the indigent insane to hospitals. The term when thus used has been held to include persons with insufficient means to pay for hospitalization

550

after providing for those who legally claim their support. (*Depue* v. *District of Columbia*, 45 App. D. C. 54 [Ann. Cas. 1917E, 414]; *In re Hybart*, 119 N. C. 359 [25 S. E. 963]; *Massachusetts Gen. Hospital* v. *Inhabitants of Belmont*, 233 Mass. 190 [124 N. E. 21]; *People* v. *Board of Supervisors*, 121 N. Y. 345 [24 N. E. 830].) █ Applying this definition to the instant case, we hold that the word "indigent", when used in connection with admissions to county hospitals, includes an inhabitant of a county who possesses the required qualifications of residence, and who has insufficient means to pay for his maintenance in a private hospital after providing for those who legally claim his support.

█ Under the maxim, "*Expressio unius est exclusio alterius*" it is urged that as the legislature has provided that certain classes of patients in the county hospitals may pay for their care, the members of no other class who can contribute to their care can be admitted, and, further, that as it is provided that those belonging to certain classes shall be admitted, no others can be received.

We cannot agree with this argument. Boards of supervisors are given broad powers in providing for the establishment and maintenance of county hospitals and in prescribing rules for their government and management. (Sec. 4223, Pol. Code.) The word "management" has been frequently defined when used in legal phraseology. When used in a statute giving the husband management and control over his wife's property it has been held to mean that it gave him the power to invest her money. (*Sencerbox* v. *First National Bank*, 14 Idaho, 95 [93 Pac. 369].) When used in the title of an act relating to reform schools it was held to include provisions in the act providing for the committing of certain juveniles to the schools. (*In re Sanders*, 53 Kan. 191 [36 Pac. 348, 23 L. R. A. 603].) See, also, *Watson* v. *Cleveland*, 21 Conn. 538; *Commissioners of Sinking Fund* v. *Walker*, 7 Miss. [6 How.] 143 [38 Am. Dec. 433]; *In re Brennan's Will*, 251 N. Y. 39 [166 N. E. 797]; *City of Topeka* v. *Independence Ind. Co.*, 130 Kan. 650 [287 Pac. 708]; *Stagway* v. *Riker*, 84 N. J. L. 201 [86 Atl. 440]. █ When a board of supervisors is given management of a county hospital that body is given the power to adopt rules for the admission of patients, provided, of course, that it must admit those entitled by law to enter and cannot admit those whose recep-

tion is prohibited by law of the Constitution. In its rules of admission it should have the power to provide for the payment for care by those not financially able to secure hospitalization in a private institution, the amount to be paid to be determined in its maximum by the cost to the county of hospitalization of each individual patient and charged to the patient on his ability to pay. In the administration of public funds the supervisors are acting as trustees and they should so administer those funds as to lighten the taxpayers' burden as much as possible.

Another class of patients which should be admitted to county hospitals deserves our consideration. In cases of public disaster such as fire, earthquake, floods, storms or epidemics, people may be injured or rendered suddenly ill and immediate hospitalization may be necessary to save life. The same is true in cases of accident or sudden illness. In such cases delays in admissions to permit investigations of the financial conditions of the patients might cause loss of life. Such patients should be admitted promptly, investigation of their abilities to pay should follow. Ordinary humanity could dictate no other course. In such cases boards of supervisors should not hesitate to collect the full cost of hospitalization from those able to pay, and from others not able to pay in full, a fair amount, to be determined after an investigation of their resources. We have stricken clause "i" from the decree of the trial court and have added another under the same letter to provide for such cases.

The decree in this case is not elastic. Over a period of years the legislature has changed and increased the classes to be admitted to county hospitals. That body may continue with such legislation and may provide for the admission of new classes, or restrict those now admitted, or place new conditions upon admissions. To take care of this contingency we have added clause "j" to the decree.

Defendants complain that the decree as rendered is uncertain in several particulars. Plaintiffs in effect admit the charge by proposing amendments to it. We have studied the decree as amended by them and have concluded that it substantially meets the objections of defendants. On our own motion we have stricken one paragraph which plaintiffs proposed to retain as we regard it as surplusage.

It is ordered that the decree of injunction rendered by the trial court on December 4, 1933, be modified by striking therefrom the words, letters and figures not appearing in the decree of injunction hereinafter set forth and adding the words, letters and figures appearing in the decree of injunction hereinafter set forth which do not appear in the said decree signed by the trial judge so that the decree of injunction in this case shall read as follows: (Following the title of the court and cause.)

"The above entitled matter having been heretofore heard and determined by the undersigned Judge of the Superior Court of the State of California, written findings of fact and conclusions of law having been heretofore duly and regularly signed and filed herein ordering judgment in favor of the above named plaintiffs and against the above named defendants as hereinafter given and made, and the case being in all respects ready for final judgment and decree:

"It is therefore ordered, adjudged and decreed that the defendants Perry Brite, Stanley Abel, W. R. Woollomes, J. C. Hart, Chas. W. Wimmer, individually, and as members of the Board of Supervisors of Kern County, and Kern County, a legal subdivision of the State of California, and each of them, and every officer, deputy, agent, appointee, subordinate, servant or employee of the above named defendants, or either or any of them, and particularly and especially the officers, deputies, agents, employees, appointees, servants, doctors, superintendents, heads of departments, internes, nurses, and assistants, and all other persons acting under defendants or any of them in any matter relating to the operation, maintenance, administration, or conduct of that certain County Hospital of the County of Kern known as the Kern General Hospital, be, and each of such persons is, and all of them are hereby forever permanently restrained, enjoined and commanded to desist from admitting to and receiving as patients of, caring for, curing, treating, boarding, nursing, furnishing food or supplies or lodging to, or hospitalizing in, said Kern General Hospital, or at or in any outpatient clinic thereof, any person who, after due inquiry and investigation, is not found to be an indigent person as herein defined, or a dependent or partially dependent person in case of emergency, or who is found, after due inquiry and investigation, to be a

person who is himself, or has a relative or relatives legally liable for his support, able to pay for and obtain proper and necessary medical or surgical or hospital care or treatment or services for himself elsewhere than in the county hospital except as hereinafter specified. The following should be admitted: (a) an indigent sick or dependent poor person; (b) a needy sick and dependent or partially dependent citizen in case of emergency; (c) a psychopath, narcotic addict or habitual inebriate temporarily in custody; (d) a physically defective and physically handicapped person under the age of eighteen years when the parents or guardian of such person are not financially able to secure proper care or treatment and when such person's admission and treatment has been duly authorized in the manner provided by law; (e) a person in the active stages of tuberculosis, in wards established for the treatment of such persons, who is able to pay for such treatment and who, when able to pay, is required to pay for such treatment; (f) a person to be quarantined or isolated in the county hospital with a contagious, communicable or infectious disease; (g) a prisoner confined to any city or county jail who requires medical or surgical treatment necessitating hospitalization where such treatment cannot be furnished or supplied at such jail when the Superior Court of the county shall have ordered the removal of such prisoner to the county hospital and said prisoner elects not to furnish such treatment at his own expense; (h) a county employee injured in the course of his employment by the county when hospitalization is reasonably required to cure and relieve the effects of such injury; (i) a person in need of immediate hospitalization on account of accident or sudden sickness or injury or by reason of sickness or injury caused by or arising in a sudden public emergency or calamity or disaster. Provided, (j) Nothing in this decree shall be construed as restraining defendants from obeying or carrying out or giving effect to any law that may be passed hereafter relating to the hospitalization of patients in county hospitals which may affect the hospital in Kern County.

"It is further ordered that plaintiffs have their costs herein expended taxed at $306.62.

"Done in open court this 4th day of December, 1933.

"K. VAN ZANTE, Judge of the Superior Court."

As so modified the judgment is affirmed. Each party will pay their own costs on appeal.

Barnard, P. J., and Jennings, J., concurred.

A petition by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on March 30, 1936.