[Civ. No. 14410.   First Dist., Div. One.   Aug. 22, 1951.]

WILLIE S. L. MADISON et al., Appellants, v. CITY AND COUNTY OF SAN FRANCISCO et al., Respondents.

Cecil F. Poole and Ulma A. Abels for Appellants.

Dion R. Holm, City Attorney, and George E. Baglin, Deputy City Attorney, for Respondents.

WOOD (Fred B.), J.—Plaintiffs appeal from a judgment entered in favor of defendant city and county of San Francisco notwithstanding the verdict rendered in favor of plaintiffs and against defendants Donald Walker and the city and county of San Francisco.

The complaint was filed June 24, 1947, by Willie S. L., Sandra L., and Walter L. Madison, the surviving husband and minor children of Irealous Madison, for damages for the death of Irealous, which occurred March 16, 1947, while she was a patient at the San Francisco Hospital, operated by respondent.

The complaint alleged and the answer (jointly filed by respondent and by defendants Monte Greer and Donald Walker) admitted that Irealous was admitted to the San Francisco Hospital and while there was delivered of a child and died. The complaint alleged and the answer did not deny that respondent is a municipal corporation; that Irealous developed a *post partum* hemorrhage; that defendant Greer and other employees of respondent, members of the medical staff of the hospital, acting in the course of their employment, examined and treated her and performed upon her an operation of transfusion of blood; that defendant Walker, employed as a technician in the blood bank and laboratory of the hospital, was in charge of and was authorized and directed to make the necessary and proper tests and samplings of blood incidental to and necessary in said operation; that defendant Greer, likewise, with full authorization, made tests and samplings of blood incidental to said operation; and that Irealous died.

At the trial, respondent and the other defendants stipulated that defendant "Donald Walker was an employee of the city and county, employed in the hospital, and also that the negligence of Donald Walker caused the death of the mother of the minor children and the wife of the adult plaintiff" and that Walker was then "acting in the course and scope of his employment."

These admissions and this stipulation left as issues, framed by the pleadings, the allegations of the complaint that respondent operated the hospital for profit in a municipal proprietary capacity; receives and cares for pay patients (other than emergency, indigent or other patients required to be admitted) in like manner as and in competition with private and other hospitals in the municipality; and received Irealous as a paying patient for hospitalization and delivery of a child.

At the conclusion of the trial, a motion for a directed verdict was made by respondent and denied by the court. The jury gave its verdict in favor of the plaintiffs and against defendant Walker and respondent, for damages in the sum of $25,000. Thereupon, respondent city and county moved for, and the court granted, judgment in favor of respondent notwithstanding the verdict.

The issue upon this appeal is whether or not there was sufficient evidence to submit to the jury on the question whether or not respondent operated the hospital in a proprietary capacity and in that capacity received Irealous as a paying patient.

Appellants base their claim that respondent is liable for the negligent act of its employee upon the theory that respondent, in its capacity of a municipal corporation, operates the hospital as a business enterprise in competition with private hospitals, and received and cared for Irealous as a paying patient. Respondent bases its claim of nonliability upon the theory that it operates the hospital in the capacity of a county, under mandate of state law in the performance of the state function of caring for the indigent sick and dependent poor (not as a business enterprise in competition with other hospitals), a governmental not a proprietary function, and that Irealous was admitted to and cared for at the hospital pursuant to that mandate, not as a paying patient.

We will consider, first, the testimony of Willie S. L. Madison, the adult appellant. He testified: On March 3, 1947, my wife and I went to the San Francisco Hospital to see if I could get her into the hospital. I went to the main door on Potrero Street—up the main ramp on the first level and walked half way down to the emergency entrance in the main door—that is called the social service office. I conversed with a lady there who was apparently in charge; I told her my purpose in coming; conversed with her about 45 minutes. I was talking to her concerning my wife going to the hospital. I asked, ''Could my wife go there; would my wife be per-

mitted in the hospital," and she said, "Yes, but she will have to pay"; that was the first thing she told me, and I said "All right." She asked where I was working, and I told her Simmons Mattress Company, 295 Bay—I was employed there. She asked how much was I making, and I told her "Approximately $50 a week, sometimes more and sometimes less." She told me I would have to pay, that I would have to pay $69. I told her I would pay it. There was discussion with her as to when I would pay. She told me what the bill would be and I told her I would pay it, and then she asked me when I would pay it and I told her, "As soon as I felt able." She didn't ask me when that would be. There was further conversation as to the date when we were going to pay. I told her that I would pay, and that the doctor that I had for my wife owed me $50, and that I would give her that. I did not ask her if I could get free hospital or medical care for my wife. That was not my intention when I went there. They told me my wife would be there approximately seven days for this $69. At the time I was out there I did not have $69 in my pocket.

No documents were produced to me at that time. I think this lady prepared some documents while this conversation was taking place. She was typing and asking questions of me during the time she was typing. I could see the typewriter. I think she typed as she asked me questions—she typed upon a yellow sheet of paper with carbon paper in between. She removed this paper from the machine and gave it to my wife to sign. I saw my wife sign it. This lady did not ask me to sign anything.

After my wife signed this document in my presence, the lady told us to go to the clinic in the hospital. We went over to the clinic, did not return to the social service office following our visit to the clinic. At the clinic I was told to return there the following week. I took my wife out to the hospital the following Tuesday, right to the clinic. The lady in the clinic (not the same person who first talked to me) told me to bring my wife back to the clinic.

I returned to the hospital March 16; took my wife back there for delivery of the baby. She was in labor at the time. I took her by automobile. We went in the emergency entrance, had no interview with any person at that time. I do not know what disposition was made of my wife at that time. I went with her to the elevator and put her in a wheelchair. Then I went home. I went back afterwards. I talked to some

nurse in the ward, asked her how my wife was going, and she said "Fine," and I could hear by wife talking and she told the nurse to tell me to take the child Sandra over to her sister's. That was about 5:30. After I talked with this nurse I had no other conversation on that day with any person at the hospital.

The next time I saw my wife she was dead. I never saw her alive after that time. On the day following that, I had a conversation with a person at the hospital. It was some man. I called up and asked how was my wife, and the next words he said, my wife was dead, and then I hung up.

When I first went to the hospital and inquired about maternal care for my wife, she had approximately three weeks to go. She had not been denied admission to any other hospital prior to going to the San Francisco Hospital. I had not tried to get her into any other place.

I was not referred to the hospital by any physician. I had not made any attempt to have her admitted to any other hospital. I was talking to some friends of mine and they told me about this hospital and then I knew about it, and it was a large hospital, so I figured it was all right. Friends of mine had children that were born at the hospital and told me about the hospital. They did not tell me that certain people were able to obtain that medical attention free. I did not have that in mind at all when I went there. I intended to pay for my wife's medical attention. I had never attempted to get my wife in any other hospital. Prior to my wife's death her health had been good. She had not received hospitalization in San Francisco prior to the time she went there in March. She had not seen a doctor before except with reference to pregnancy. She had had no serious illness. She was not employed. She kept her home, and took care of the older child. She had been kindly and affectionate, by disposition, to our child. I did not ask anyone before going to the hospital what office I had to go to concerning medical care for my wife. I arrived at the social service office because that is the only door I saw they had, that the office was set up in; so we went in there and started talking to the lady and she talked to us there.

Prior to March, 1947, I had a doctor for my wife and was paying in advance for his services to deliver the baby; had paid him $50. My wife and I decided to go to a hospital, and the doctor agreed to refund the money to me. He agreed to that before I took her to the hospital.

Other than the occasion on which I first went to the hospital, concerning which I have testified, I never had any conversation with any person with respect to my payment for hospitalization for my wife at the hospital. Nobody else ever mentioned to me about paying; that is, no one did so again. I never received a bill and never made an attempt to pay the $69. After my wife's death, I never received any kind of a bill from the hospital. I never paid the $69. I never saw and was never shown any of the papers which were being prepared in the social service department the first day I went there.

I have been a resident of San Francisco ever since 1944. I was in the military service and was discharged June 6, 1946, and thereafter returned to San Francisco. I went to work for the Simmons Company August 4, 1946, and worked for them the balance of that year. I worked regularly during the first three months of 1947—still employed by the Simmons Company. I was working regularly, making approximately $50 more or less a week—my take-home pay. Following the death of my wife, I continued to work, and was still employed October 29, 1947, when my deposition was taken; and I am still employed (April, 1949).

My wife had been a resident of San Francisco maybe a year at the time she was admitted to the hospital. She was first here in 1945. Her original home was Winfield, Louisiana. At the time of her death my wife was 24 years old. My child, Sandra, is now (April, 1949) three years old. My other child, Walter, who was born when my wife went to the hospital, is now two years old.

After my wife died, my sister-in-law took care of the two children. She lives in San Francisco. I was giving my sister-in-law $10 a week in having her take care of the children, and then I gave her different things. The $10 was for my sister-in-law because she had to stay with them all the time; that was for minding my children. At present the children are in Winfield, Louisiana, in the care of my mother-in-law. My sister-in-law took the children to her. The reason was it was cheaper living down there and my mother-in-law could take care of them better. They were taken there about June, 1947. They have been there ever since. I am contributing to the support of my children.

I paid the undertaker. I think the amount of the bill was about $300.

This testimony of the widowed father of the infants Sandra and Walter might seem to support implied findings of the jury that respondent operated its hospital as a business enterprise and received and cared for the wife and mother as a paying patient. However that might be if this were a private hospital, we are only at the threshold of the inquiry when concerned, as here, with a publicly owned institution. We must consider the legal sanctions which govern its conduct and the admission and treatment of patients. However great the urge may be to find respondent legally obligated to afford some measure of monetary relief to the members of this bereaved family for their tragic and incalculable loss admittedly caused by the negligent act of respondent's employee, a legal basis for such an obligation must first be found.

Our search starts with an examination of the San Francisco charter and ordinances and regulations adopted under it, for respondent is a consolidated city and county organized and existing under a charter adopted pursuant to the provisions of sections 8 and 8½ of article XI of the state Constitution (Stats. 1931, ch. 56 of Res., p. 2973). By section 2 of its charter respondent has invoked, and therefore enjoys the power, conferred by sections 6 and 8 of article XI of the Constitution, to "make and enforce all laws and regulations in respect to municipal affairs, subject only to the restrictions and limitations provided" in its charter, and "in respect to other matters" is "subject to and controlled by general laws." It thus has and performs the functions of a county and of a city. When acting in respect to a municipal affair it is free of state legislative control but when acting in respect to any other matter it is subject to and controlled by state general laws. The "functions performed in the particular case determine whether San Francisco is to be viewed as a city or a county." (*San Francisco* v. *Collins*, 216 Cal. 187, 191 [13 P.2d 912].)

We find in the charter nothing which directly indicates whether respondent's hospital is a city or a county institution, nor whether it is governmental or proprietary in character. Jurisdiction over the hospital is distributed between respondent's board of supervisors and its director of public health. According to section 2 of the charter, "The exercise of all rights and powers of the city and county when not prescribed in this charter shall be as provided by ordinance or resolution of the board of supervisors." Section 9 similarly provides that "The powers of the city and county, except the powers

reserved to the people or delegated to other officials, boards or commissions by this charter, shall be vested in the board of supervisors, and shall be exercised as provided in this charter." Section 2 further provides that "All functions of the city and county, and the powers and duties of officers and employees charged with the performance thereof, . . . as existing at the time this charter goes into effect, shall continue to be the functions of such departments and offices and the powers and duties of officers and employees assigned thereto, except as in, or under authority of, this charter otherwise specifically provided." Section 61 provides that the functions, activities and affairs of the city and county placed under the chief administrative officer by the charter shall be allocated by him among certain departments, including the "Department of Public Health, which shall include the functions, institutions and personnel of the department of public health as existing at the time this charter shall go into effect . . . Said department shall be administered by a director of health . . . The director of public health shall have and continue the powers and duties of the health officer and the board of health, from and after twelve o'clock noon on the 8th day of January, 1932 . . ." By this reference to the former charter, the director of public health was given "the management and control of the city and county hospitals, almshouses, ambulance service, municipal hospitals, receiving hospitals, and of all matters pertaining to the preservation, promotion and protection of the lives of the inhabitants of the city and county" (Stats. 1899, ch. 2 of Res., art. X, § 3, p. 241 at p. 343). That gave the former department and in turn the present director quite extensive authority over respondent's hospital and its functions, subject, however, to the power which the charter of 1899 gave the board of supervisors "to establish, maintain and regulate, and change, discontinue and reestablish city and county . . . hospitals and almshouses." (Stats. 1899, ch. 2 of Res., subd. 11 of § 1 of ch. II of art. II, p. 241 at p. 249.) The conclusion is inescapable that the charter of 1899 gave the former department of public health powers that were merely administrative in character, subordinate to the legislative powers which that charter gave the board of supervisors. Accordingly, section 61 of the charter of 1931, when it transferred the powers of the old department to the new director, did not vest in the latter any power to legislate. It thereby created no exception to those provisions

of sections 2 and 9 of the 1931 charter which vest respondent's legislative power in its board of supervisors.

Moreover, the charter of 1899 was, in form, a grant of power to the city and county. The powers granted were specifically enumerated. At that time the Constitution provided that charters, "except in municipal affairs, shall be subject to and controlled by general laws." (Art. XI, § 6, as amended Nov. 3, 1896.) The prevailing opinion then was that the charter must enumerate the home rule powers which a city or city and county desired to have. The 1914 amendments to sections 6 and 8 of article XI made it clear that the charter need only invoke the home rule privilege and then the city and county would have full power in "municipal affairs" (without enumeration), unlimited by state general laws, subject only to limitations expressed in the charter itself. (See *West Coast Adv. Co.* v. *San Francisco,* 14 Cal.2d 516, 523 [95 P.2d 138].) The provisions of the former charter did not expressly give respondent's board of supervisors or its department of public health authority to put respondent into the hospital business in competition with private hospitals. Without the grant of such authority, expressly or by necessary implication, it is doubtful if respondent had power to operate a hospital other than in a governmental capacity, under the old charter as adopted in 1899. The Supreme Court, in *Hyatt* v. *Williams* (1906), 148 Cal. 585 [84 P. 41], applied such a rule of construction when interpreting the Stockton city charter of 1889, and concluded that the grant therein of power "To provide for and regulate . . . lighting and watering of the streets . . . and public places," and "To provide for . . . such lights . . . as are necessary for the convenient transaction of public business," and to "determine and declare what are public uses, and when the necessity exists of condemning lands therefor, and what are the lands it is necessary to condemn," did not grant power to maintain works and carry on the business of supplying the inhabitants of the city with light. (P. 587.) The court observed that providing light for public places and supplying light to the inhabitants generally for their private use are separate and distinct purposes. "The terms of the express grant of the power to provide light for the public purposes named do not indicate any intention to give the distinct and larger power to establish a plant for furnishing light for private use to all the inhabitants of the city who may desire it, and no such intention can be imputed to the framers of the charter from the

language there employed." (Pp. 587-588.) That reasoning is persuasive of the view that the grant of power (by the San Francisco charter of 1899) to the board of supervisors to establish, maintain and regulate "city and county . . . hospitals and almshouses," and to the department of public health to manage and control "the city and county hospitals, almshouses, ambulance service, municipal hospitals, receiving hospitals," had reference solely to the conduct of such hospitals as governmental institutions and did not, expressly or by necessary implication, confer authority to establish or maintain any of them as a business enterprise for the private use of all of the inhabitants who might desire it.

In 1925, the former charter of San Francisco was amended to give respondent's board of supervisors the power "To make and enforce all laws and regulations in respect to municipal affairs, subject only to the restrictions and limitations provided in this Charter." (Stats. 1925, ch. 10 of Res., p. 1159; adding subd. 44 to § 1, ch. II, art. II, at p. 1165.) That amendment gave the board of supervisors power, on behalf of respondent as a city, to provide for the maintenance of a hospital as a business enterprise in competition with private hospitals, a power which that board still has by virtue of the provisions of sections 2 and 9 of the charter of 1931.

It follows that we must look to ordinances adopted by respondent's board of supervisors, not to regulations promulgated by its director of public health, in ascertaining the legal sanctions under which its hospital operates.

The applicable provisions of ordinances adopted by the board of supervisors of respondent city and county are in evidence. By stipulation, portions of sections 150 and 151 of the Health Code of San Francisco were read into evidence. Those portions of section 150 read as follows: "There shall be admitted to the San Francisco Hospital, including the Isolation Division and the Hassler Health Home, the following: (a) An indigent sick person of the City and County of San Francisco who possesses the required residence qualifications, upon application and after investigation and approval by the Director of Public Health." "(i) An expectant mother who is unable to pay for her care and the cost of her maintenance (and care shall be paid by and be a proper charge against the county of her residence); (j) An indigent sick or dependent poor person from another county which lacks the proper facilities for the caring of such patients (and care shall be paid by and be a proper charge against the county

of which said person is a resident)." We find here three classes of patients: The indigent sick of the city and county, expectant mothers who are unable to pay, and the indigent sick or dependent poor of other counties that lack proper facilities for their care.[1]

These are classes of persons in respect to whom the state imposes upon respondent, as a county, the obligation of care. The text of subsection (a) of section 150 of the local code follows closely the text of section 200 of the Welfare and Institutions Code, which declares that the board of supervisors in each county "may provide for the care and maintenance of the indigent sick or dependent poor of the county," and the text of section 2500 of the state code which declares that "Every county and every city and county shall relieve and support all incompetent, poor, indigent persons and those incapacitated by age, disease, or accident, lawfully resident therein, when such persons are not supported and relieved by their relatives or friends, or by their own means, or by State hospitals or other State or private institutions." The text of subsection (i) of section 150 of the local code follows almost literally the text of section 204 of the state code, which declares that "In any county[2] where a county hospital has been established, any expectant mother who is unable to pay for her necessary care shall be admitted to the county hospital, and the cost of her maintenance and care shall be a proper charge against and shall be paid by the county of her residence." Subsection (j) of section 150, in turn, implements the sanction given by section 202 of the state code for reciprocal arrangements between counties for the care of the hospital eligibles of one county at the hospital of another county.

---

[1]The suggestion has been made that the ordinance, in declaring that these three classes "shall be admitted," does not negative the admission of patients able to pay for their care. That is literally true but does not operate to sanction the admission of such patients.

As to this hospital, sanction therefor must be found, expressly or by necessary implication, in the provisions of some ordinance adopted by respondent's board of supervisors. There is no evidence herein of such an ordinance, and this court may not take judicial notice of such an ordinance, if there is one. (*Beard* v. *City & County of San Francisco,* 79 Cal.App.2d 753, 755 [180 P.2d 744].)

Nor may the existence of such an ordinance be presumed from the fact that administrative officials have exercised powers (if they have) predicated upon its existence. (See *Haub* v. *Tuttle,* 80 Cal.App. 561, 569 [251 P. 925], and *Special Assembly Int. Com.* v. *Southard,* 13 Cal.2d 497, 508-509 [90 P.2d 304].)

[2]As used in the state code, "county" includes "city and county." (Welf. & Inst. Code, § 14.)

The applicable provisions of section 151 of the local code provide for the fixing of "the proper and reasonable amounts"[8] to be charged to patients who by themselves or through relatives are "legally obligated and able to pay in whole or in part" for the "institutional care" furnished. These provisions implement the requirements of the state general laws that "All aid rendered by the county" to indigents under sections 2500-2615 of the Welfare and Institutions Code "shall be a charge against the spouse, parent and adult child of the recipient thereof and the county rendering aid shall be entitled to reimbursement therefor" (Welf. & Inst. Code, § 2576) and that "If a person for the support of whom public moneys have been expended acquires property, the county shall have a claim against him to the amount of a reasonable charge for moneys so expended" (Welf. & Inst. Code, § 2603), and the state policy that "so far as it is possible an applicant for public relief shall be required to apply his own property to his support" (Welf. & Inst. Code, § 2600). The collection of such charges is consonant with the conduct of the county hospital as a governmental institution. "In its rules of admission it [the county board of supervisors] should have the power to provide for the payment for care by those not financially able to secure hospitalization in a private institution, the amount to be paid to be determined in its maximum by the cost to the county of hospitalization of each individual patient and charged to the patient on his ability to pay. In the administration of public funds the supervisors are acting as trustees and they should so administer those funds as to lighten the taxpayers' burden as much as possible." (*Goodall* v. *Brite,* 11 Cal.App.2d 540, at p. 551 [54 P.2d 510].)

Louis A. Moran, assistant business manager of respondent's health department, testified that the hospital is managed under the direction of that department and is organized and functions under the regulations of the Health Code of San Francisco; that the admission of people into the hospital is governed by that code; that the patients are classified according to the types of patients which section 150 of that code prescribes may be admitted; that there is no classification for admission of patients able to pay for their care except when a patient who might be able to pay is admitted on an emergency

---

[8]These amounts are fixed each year by the board of supervisors (after computation by the director of public health and recommendation by the controller) based upon the per diem cost for each class of patients; i.e., total expenses divided by the total number of patient days.

basis; and that the rules of the hospital as he understands them are to the effect that patients who are able to pay for hospitalization and care are not admissible, with the general exception that emergency patients may be able to pay for their care and may be billed for their care.

The evidence demonstrates that this hospital is operated by respondent as a county (an agent of the state) in performing the duty imposed by the general laws of the state to provide for the care of the indigent sick and dependent poor and "any expectant mother who is unable to pay for her necessary care." As stated in *San Francisco* v. *Collins, supra,* 216 Cal. 187, at pp. 191-192, "The duty to relieve the indigent, established by state statute, is . . . a matter of statewide interest, in which the city and county of San Francisco is governed by the general law, and acts as a county—an agent of the state."

It follows that respondent operates this hospital in a governmental capacity and is not liable for the injury of a patient caused by the negligent acts of an employee of respondent. It is precisely the situation presented to our Supreme Court in 1862, in respect to the treatment and care of the indigent sick at the Yuba County Hospital, when that court said that "a *quasi* corporation, like a county, is not liable for the acts of officers or employees which it appoints in the exercise of a portion of the sovereign power of the State, by the requirements of a public law, and simply for the public benefit, and for a purpose from which the county, as a corporation, derives no benefit." (*Sherbourne* v. *Yuba County,* 21 Cal. 113, at p. 115 [81 Am.Dec. 151].)

This doctrine of nonliability of the state and its agencies for injuries caused by the negligence of an employee engaged in the discharge of a governmental function originated in the fiction that the king can do no wrong. "It may be said that the doctrine arose in the former times from the practical necessity of enabling the state to exercise its governmental functions unhampered by the demands on the exchequer resulting from the carelessness or mistakes of its officers and agents in the discharge of their official duties. In the words of Story, Agency, 8th edition, section 319, the government 'does not undertake to guarantee to any persons the fidelity of any of its officers or agents whom it employs; since that would involve it, in all its operations, in endless embarrassments, and difficulties, and losses, which would be subversive of the public interests.' The doctrine has had widespread

acceptance as a part of the American common law, and has been deemed to prevail except where it had been departed from by constitutional and statutory law, as interpreted and applied by the courts.'' (*People* v. *Superior Court*, 29 Cal.2d 754, at p. 756 [178 P.2d 1].)

The doctrine of nonliability of a county for the negligent injury of a county hospital patient has not been modified by constitution or by statute, and still prevails in this state. This is demonstrated by an unbroken line of judicial decisions. (*Goodall* v. *Brite* (1936), *supra*, 11 Cal.App.2d 540; *Calkins* v. *Newton* (1939), 36 Cal.App.2d 262 [97 P.2d 523]; *Griffin* v. *County of Colusa* (1941), 44 Cal.App.2d 915 [113 P.2d 270]; *Latham* v. *Santa Clara County-Hospital* (1951), 104 Cal.App. 2d 336 [231 P.2d 513].) In each of the four cases last cited a hearing was denied by the Supreme Court.

Nothing to the contrary is indicated by certain decisions, invoked by appellants, concerning respondent's hospital. In one of them, *Bloom* v. *San Francisco*, 64 Cal. 503 [3 P. 129], the Supreme Court affirmed a judgment that had been rendered against the city and county for damages caused by the city and county conveying refuse from its hospital, over plaintiff's land, in a defective trough, which burst and discharged its contents upon the land. In affirming the judgment, the court said: ''We think the city and county of San Francisco had such proprietorship of the city and county hospital as rendered it liable for damages in the case as presented in the transcript.'' (P. 504.) The word ''proprietorship'' as therein used had no reference to the proprietary as distinguished from the governmental function. The city's liability was predicated upon the maintenance of a nuisance by the city and a taking of private property for public use (not upon the theory of the responsibility of a proprietor for negligence of its employees), as this court indicated in *Davie* v. *Board of Regents*, 66 Cal.App. 693, at page 701 [227 P. 243].

In *People* v. *Williamson*, 135 Cal. 415 [67 P. 504], a quo warranto proceeding, the court found that the San Francisco Board of Health, then recently created by the charter adopted in 1899, legally exercised and had superseded (at least as to some functions and powers) the old local board of health, created by statute, which until the adoption of the charter had been in charge of San Francisco's hospitals and almshouses. The following remarks of the court in that case merit comment: ''It is evident that the powers conferred upon and the duties required of this [new] board are strictly

municipal in their character. All that is required of the board is peculiarly for the inhabitants of the city, and not directly for the benefit of any one else,'' and that ''This board, with its functions, being in its nature an 'affair' appropriate for a municipality, and being actually contained in the charter, is a 'municipal affair,' within the meaning heretofore given to the phrase 'municipal affair.' '' (135 Cal. at p. 417.) The court also said, ''The charter board certainly has some of the powers which the charter confers upon it, and if to any extent the code sections creating the former board are inconsistent with the valid grant of power conferred by the charter, to that extent they are superseded by the charter.'' (P. 419.) Justice McFarland specially concurred upon the ground ''that it does not appear that the charter board of health is an illegal body or is wrongfully usurping powers,'' adding that ''The public health is not a 'municipal affair' in the sense of excluding the jurisdiction of the state over the subject.'' (P. 420.) Justices Harrison and Garoutte specially concurred upon similar grounds. It is clear that the Williamson case did not decide the question whether this hospital was operated as a proprietary enterprise or as a governmental facility. In a companion case, *Weaver* v. *Reddy*, 135 Cal. 430 [67 P. 683], the plaintiff claimed that the old statutory board of health had unlawfully removed him from the superintendency of the almshouse. But, after the commencement of the action, the 1899 charter took effect, and it created a new board of health, vesting in it the management of San Francisco's hospitals and almshouses, thereby divesting the old statutory board of such power of management. This rendered moot and academic the questions upon appeal in the Weaver case. In so holding, the court said: ''That the management of hospitals and alms-houses is a municipal matter, we think requires no discussion'' (p. 431), but by that remark could have meant only that provision for the management of local institutions, including hospitals, was appropriate in a charter adopted under authority of sections 8 and 8½ of article XI of the Constitution, not that it was a city as distinguished from a county function, nor, in either case, that it was a proprietary as distinguished from a governmental activity.

*Beard* v. *City and County of San Francisco, supra,* 79 Cal.App.2d 753, involved merely the issues upon demurrer to a complaint which alleged that plaintiff had placed his child in the city and county hospital as a paying patient, that the

hospital was operated by the defendant in a proprietary capacity, and that because of negligent supervision the child fell from its crib and died. It was legally possible that defendant, pursuant to ordinances adopted under authority of the municipal affairs home rule provisions of its charter, was operating the hospital in a proprietary capacity. Because the court could not take judicial notice of such ordinances, if any, the complaint presented mixed questions of fact and law. The case had to go to trial, could not be decided upon demurrer. That, obviously, was not a holding that respondent's hospital is operated in a proprietary capacity.

In this state of the case it is unnecessary to decide whether Irealous was able to pay for her care and, if so, whether respondent's employees admitted her to the hospital as a paying patient. For she was admissible only as "an expectant mother who is unable to pay for her care." If respondent's employees admitted her as a paying patient, able to pay, they acted outside the scope of their authority and there could ensue no legal responsibility upon the part of respondent for injuries caused by the negligent acts of its employees in the care of the patient. "A governmental agency does not incur liability for negligence by doing an act which is *ultra vires.*" (*Calkins* v. *Newton, supra,* 36 Cal.App.2d 262, at p. 268. See, also, *Latham* v. *Santa Clara County Hospital, supra,* 104 Cal.App. 2d 336, at p. 339, and cases cited.)

We do not wish to give the impression that the evidence demonstrates that respondent's agents acted beyond the scope of their authority when they admitted Irealous as a patient. An expectant mother need not be a pauper to be "unable to pay for her care," within the meaning of that expression as used in the state and local codes. The policy of providing hospital care for the deserving needy was well expressed in *Goodall* v. *Brite, supra* (11 Cal.App.2d 540, at p. 549), in these words: "Under the principles of humanitarianism, and in the interest of a sound policy, we are compelled to hold that a patient in need of hospitalization, who cannot himself, or through legally liable relatives, pay the charges of a private institution, should be admitted to the county hospital because the care of such sick or injured promotes the public health and general welfare of the community in which he lives." The word "indigent," when used in connection with admissions to county hospitals, was defined by the court in the Goodall case as including a person "who has insufficient means to pay for his maintenance in a private hospital after

providing for those who legally claim his support." (11 Cal.App.2d at p. 550.) That, we believe, is the meaning of the expression "unable to pay for her necessary care" as used by the Legislature in section 204 of the Welfare and Institutions Code. The witness Moran testified that respondent's hospital is organized for the care of indigent patients; that the rate chargeable in March, 1947, to patients able to pay in whole or in part for their care at this hospital was $9.33,[4] which included the services of medical as well as other paid personnel; that according to the standards of admission, assuming a family of husband, wife and child, all in good health, and the husband a wage earner receiving a net income (after deductions) of $50 a week, the wife would not be able to pay for her care, would be eligible as a free patient. He stated that he took into consideration the fact that in 1947 the costs of living were very high. He added that if the wage earner had considerable money in the bank he might be able to pay. He further testified that, if, instead of $50, the wage earner were making $65 a week, with a family of three, presumably paying a moderate rent where he lived, he would be able to pay in part for the care, about two thirds; if he were making $60 a week he would be able to pay about half of the cost of the care; if he were making $55 a week he probably would be able to pay none of the cost. The witness was assuming the prognosis of the patient favorable, the patient able to take care of her family when discharged, no unexpected expenses in the family end of it, that the wage earner had some assurance of continued employment, and that the children were reasonably healthy and well. This evidence indicates that in determining a person's ability to pay for hospital care, respondent takes into consideration the financial burden resting upon that person of "providing for those who legally claim his support." When a person applies for admission, he or she is interviewed by a social service worker. According to the witness Marie Heick, a social service worker at the hospital, a record is kept of every patient admitted, consisting of the family history, residence, financial status, employment of members of the family, past medical care, and financial eligibility for county care. Certain forms are filled out and signed by the applicant at the initial interview. From these forms the information is garnered that enables the department to make its investigation. An investigation is made in most

[4]There was evidence that at one private hospital in the city and county the minimum daily rate per patient was somewhat in excess of $15.

cases; after the patient leaves, if not prior to entrance. If the need for hospitalization is immediate, there is not time to complete the investigation prior to entrance. The witness produced the social service record of Irealous Madison. It included four forms, each bearing the signature "Irealous Madison." One of them indicated that prior to admission to the hospital the patient made a statement that her husband had no funds other than $26 in the bank; that he was a disabled veteran and had applied for a pension; that he was a laborer; that he last worked one and one-half weeks prior to February 28, 1947, and had been employed one and one-half months at his present place of employment. Willie Madison testified that he heard questions asked and answers given by his wife, but did not hear her make those statements which appeared upon that form; did not remember if such questions were asked; that they were not asked of him at any time; that he had no money in the bank at that time and that he was steadily employed.

It appears, therefore, that there was substantial evidence to support an administrative determination that Irealous was an expectant mother "unable to pay for her necessary care," and as such was admitted to the county hospital. It is a serious question if on that evidence it would be legally proper for a court or a jury to substitute its judgment for that of the county administrative officials in whom the law has vested the duty and responsibility of deciding whether Irealous was an eligible applicant. " 'Courts should let administrative boards and officers work out their problems with as little judicial interference as possible.' " (*Spaulding* v. *Philbrick,* 42 Cal.App.2d 58, 61 [108 P.2d 59], quoting from *Maxwell* v. *Civil Service Commission,* 169 Cal. 336, 339 [146 P. 869].) The scope of judicial review is of a limited character when the attack upon the administrative finding is collateral in nature. (*Bank of America* v. *Mundo,* 37 Cal.2d 1, 5 [229 P.2d 345].) However, as we have observed, that question is not presented for decision upon this appeal, for under the law respondent is not liable to appellants for the negligence of its employee, Walker, irrespective of whether the hospital officials acted within or without the scope of their authority in admitting Irealous as a patient.

This is a harsh rule of law which deprives a person of recourse against a county for injuries caused by the negligence of county employees entrusted with his treatment and care as a patient. The doctrine of governmental immunity

stems, as we have observed, from the ancient fiction that the king can do no wrong. Appellant invokes a trenchant criticism of that doctrine, voiced by the Supreme Court of New Mexico in *Barker* v. *City of Santa Fe*, 47 N.M. 85 [136 P.2d 480], at p. 482: "It is asserted by some law writers and decisions that there has been a growing demand from society in general that the governmental agencies or subdivisions should not be immune from tort liability.

"The writer of the Annotation, 'Rule of municipal immunity from liability for acts in performance of governmental functions as applicable in case of personal injury or death as result of a nuisance,' in 75 A.L.R., page 1196, says: 'The whole doctrine of governmental immunity from liability for torts rests upon a rotten foundation. It is almost incredible that in this modern age of comparative sociological enlightenment, and in a republic, the medieval absolutism supposed to be implicit in the maxim, "the King can do no wrong," should exempt the various branches of the government from liability for their torts, and that the entire burden of damage resulting from the wrongful acts of the government should be imposed upon the single individual who suffers the injury, rather than distributed among the entire community constituting the government, where it could be borne without hardship upon any individual, and where it justly belongs.'

"A criticism of the reasons assigned in support of the doctrine so much under attack will be found in an article in Brooklyn Law Review, April, 1932, entitled: 'Should the Liability of Municipalities in Tort be Extended to Include Injury and Damage Caused in the Negligent Performance of a Governmental Function?'

"In an annotation 'Municipal immunity from liability for torts,' in 120 A.L.R. 1376, it is stated that the doctrine of immunity rests upon three grounds: First, the technical rule that the sovereign is immune from suit; second, the ancient idea that it is better that the individual should suffer an injury than that the public should suffer an inconvenience; and third, that liability would tend to retard the agents of the City in the performance of their duties for fear of suit being brought against the municipality. The writer then proceeds with what to many would seem a plausible condemnation of each of these grounds of support of the ancient and rigorous doctrine."

In an article entitled *"Municipal Tort Liability in Operation,"* 54 Harvard Law Review, pages 437-462, cited by appel-

lants herein, the authors state that "Legal scholars . . . have long since made it plain that sovereign immunity has no proper place in the life of a municipal corporation" (p. 438). "[T]he governmental-proprietary rule often produces legalistic distinctions that have only remote relationship to the fundamental considerations of municipal tort responsibility" (p. 443). "There is little reason to doubt that the genuine interest of the public would be well served by abrogation of the long-accepted immunity rule. It is equally clear that neither effective administration nor general respect for the law can be had under a system so obviously eclectic and unfair in its operation" (p. 460). The authors recommend that "the present hit-and-miss application of partial tort liability be immediately replaced with a rule of complete tort liability" and that "recovery in tort actions against the municipality be confined to actual monetary damages" (p. 461).

While it is true that the trend of judicial decisions and legislative action is to confine, not enlarge—to restrict, not extend—this doctrine of governmental immunity (see *People* v. *Superior Court, supra,* 29 Cal.2d 754, at 756-762), it is not within the province of this, an intermediate court, in view of the unvarying line of decisions from 1862 to date, to undertake a re-examination of that doctrine and its application to a county in the operation of a hospital pursuant to the mandate of the general laws of the state. As said in *Latham* v. *Santa Clara County Hospital, supra,* 104 Cal.App.2d 336, at page 339: "Much as we may deplore a rule of law which deprives the indigent, who are least able to bear the loss, along with the wealthy, if they are admitted to a county hospital as patients, of recourse against the county for tortious injuries therein received, an intermediate appellate court must accept the settled law as it finds it."

The judgment appealed from is affirmed.

PETERS, P. J., and BRAY, J.—We concur. We do so solely because the prior cases of the Supreme Court, and of the District Courts of Appeal in which hearings have been denied, have held that a county is not liable for the tortious acts of its agents in the operation of a county hospital. As an intermediate appellate court we are bound by those prior decisions, even if we do not agree with them.

The whole doctrine of governmental immunity for tort needs reappraisal. It has, of course, been greatly limited by statute. In the related field of liability of charities for tort the Supreme

Court, a few years ago, reappraised the law, overruled prior decisions, and imposed liability. A similar reappraisal in the field of governmental immunity is sadly needed. With the multitude of activities of government today, city, county, state and federal, it is logically unsound to draw hairline distinctions between proprietary and governmental functions, and to impose or refuse to impose liability accordingly. To argue that a county can only operate a hospital for indigents in the performance of a governmental function, and that if it takes in pay patients and acts in a proprietary capacity its acts are ultra vires and therefore no liability is imposed, is technical, unrealistic and unjustified. But that is what the prior cases have held.

Here admittedly, the city's employees negligently killed this woman. A hospital employee negligently furnished the wrong kind of blood. Had the hospital employee negligently operated an automobile in the course or scope of his employment, or negligently used hospital property, liability would exist under some circumstances under the Public Liability Act imposing liability on counties for injuries resulting, among other things, from the defective condition of public "works and property" where certain conditions exist. In the instant case the evidence shows that the patient was a pay patient. Yet no liability exists because this is a county hospital performing a "governmental" function, and if it was acting in a proprietary capacity its acts were ultra vires and not binding on the counties. Of course, the doctrine of ultra vires has long been abolished as to private corporations and has largely outgrown its usefulness as to municipal corporations.

The doctrine of nonliability of government for tort is largely predicated, as the main opinion points out, on the old common law legal fiction that the king could do no wrong. However logical such doctrine may have been when the courts were, in a realistic sense, the king's courts, and however practical the doctrine may have been when government was limited in its activities and revenues, under modern conditions the original reasons for the rule no longer exist. When the reason for the rule is gone, the rule should be abrogated. Blind following of antiquated and outgrown precedent should not be countenanced.

If relief is to be secured from the technical and outmoded rules now applicable to the subject of liability of government for the operation of hospitals, such relief must be secured

from the Supreme Court or the Legislature, and not from an intermediate court that is bound by prior decisions.

Appellants' petition for a hearing by the Supreme Court was denied October 19, 1951. Carter, J., voted for a hearing and filed the following opinion:

CARTER, J.—I dissent.

While voting to grant a petition for hearing in the Supreme Court after decision by a District Court of Appeal is ordinarily sufficient to indicate my disapproval of the holding of the intermediate appellate court, in this case I deem it advisable briefly to state my reason for so voting.

There can be no doubt but that both the majority and concurring opinions of the District Court of Appeal followed the rule which has been heretofore announced in cases of this character by the Supreme Court and District Courts of Appeal of this state. This rule is based upon the old outmoded and outgrown maxim that "The King Can Do No Wrong," or the doctrine of sovereign immunity. This had its origin in medieval English theory and was introduced in this country without sufficient understanding. (*Government Liability in Tort*, Borchard, 34 Yale L.Rev. 1.) It has been pointed out that what the maxim really meant was that the King was privileged to do no wrong—that if his acts were against the law, they were wrongs—not that he should be immune from the consequences of his unlawful acts. However that may be, there was never any reason for its incorporation into the law of this country where democracy exists and where we are said to have a "*government of the people, by the people and for the people.*" It requires but a slight appreciation of the facts to realize that in Anglo-American law the individual citizen is left to bear almost all the risks of a defective, negligent, perverse or erroneous administration of the state's functions—an unjust burden—which is becoming graver and more frequent as the government's activities become more diversified and as we leave to administrative officers in even greater degree the determination of the legal relations of the individual citizen. The government obviously cannot insure the citizen against all defects and errors in administration, but there is no reason why the most flagrant of the injuries wrongfully sustained by the citizen, those arising from the torts of the officers, should be allowed to rest as they now generally

do, in practice, if not in theory, at the door of the unfortunate citizen alone.

I cannot follow the reasoning that a county or municipality in operating a hospital, where a charge is made to a patient for services rendered, is not engaged in a proprietary activity, and in my opinion the defendant in the case at bar was so engaged, and should be held liable for the negligence of its employees which directly caused injury to such a patient.

The reasoning which supports the doctrine of sovereign immunity in cases of this character is so fallacious and unsound that it should shock the intelligence, as well as the sense of justice, of those who believe in the American way of life. In my opinion, decisions of this kind are not only productive of widespread disrespect for the law and courts but can be used as the basis for propaganda which affects the stability of our government.